753 A.2d 701

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. RICHARD J. CHIPPERO, DEFENDANT–
APPELLANT.

Argued March 28, 2000—Decided June 30, 2000.

*Frank J. Pugliese,* Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres,* Public Defender, attorney).

*Nancy A. Hulett,* Deputy Attorney General, argued the cause for respondent (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

STEIN, J.

This appeal concerns the admissibility of defendant's confession to, among other crimes, murder and aggravated sexual assault. Defendant sought to suppress the confession because he was arrested without probable cause, as the State acknowledged. The trial court admitted the confession because it found that the police obtained information during the interrogation, but prior to the confession, that gave them probable cause to continue interrogating defendant. The Appellate Division affirmed the admissibility

of the confession but disagreed with the trial court's reasoning, holding instead that the confession was admissible because the nine-hour interrogation of defendant purged the taint of the illegal arrest. We reverse the judgment of the Appellate Division and remand the matter for retrial.

I

On July 23, 1991, Ermina Ross Tocci was found dead in her North Brunswick mobile home by her longtime live-in boyfriend, John Simmons. Tocci had been stabbed in the neck and raped. Simmons and Tocci's brother, Anthony Tocci, initially were considered suspects. Simmons was interviewed the evening of the murder. He told police that he stopped at Tocci's mobile home around lunchtime the day of the murder and did not return there until after nine o'clock that evening.

On July 25 Kevin McMenemy, a former neighbor of Tocci, contacted the North Brunswick police. McMenemy told police that on the day of the murder he drove to pick up his daughter at her mobile home that was located near Tocci's. McMenemy stated that at 2:39 p.m. that day, while waiting for his daughter, he observed a man walk quickly from alongside the victim's mobile home into the immediately adjacent mobile home, the home of defendant. McMenemy saw perspiration, but no blood, on the man's shirt.

That same day, based on the information from McMenemy, North Brunswick detectives and the Middlesex County Prosecutor's Office received and executed a search warrant for defendant's mobile home. Defendant's grandmother let the detectives in. His brother told them that defendant was fishing. While some detectives searched defendant's residence, others went to find defendant, including Middlesex County Investigator Charles Clark and Lieutenant Frank Mozgai of the North Brunswick Police Department.

The detectives found defendant at nearby Farrington Lake. One detective approached defendant and identified himself as a police

officer. When the officer approached him, defendant acknowledged that he was Richard Chippero and immediately stated that he had a fishing license. Defendant was then patted down, handcuffed, and transported to the prosecutor's office. On the way there, he expressed concern about his bicycle and fishing gear. At 1:59 p.m., defendant waived his *Miranda* rights, signing the *Miranda* card as "Reverend Richard J. Chippero."

The facts following defendant's arrest and interrogation are disputed. Defendant told experts who examined him and opined about the voluntariness of his confession that the ensuing interrogation was an extremely stressful event. Consistent with the police officers' account of the interrogation, one expert opined that defendant "underwent significant psychological alterations during the interrogation." Contrary to the officers' accounts, however, defendant told defense experts that he asked for a lawyer, that he requested that the officers terminate the interrogation, and that he was given extra doses of his own Valium during the interrogation. One expert summarized defendant's recollection of the interrogation as follows:

> Mr. Chippero describes his emotional condition over the course of the interrogation as first hostile to the idea of being taken in handcuffs for the interrogation; to becoming greatly distressed in response to the building pressures of an accusatory interrogation which included false evidence claims; to fear as he considered fleeing or attempting to leave the interrogation and as he imagined the police killing him if he even stood up. Following this growing stress and distress, Mr. Chippero draws a blank. He relates that he is unable to remember anything about the last portion of the interrogation, the part that culminated in the recorded statement. He simply has no recall of making the statements memorialized on tape.

The State's account of the interrogation is quite different. At the outset, two armed police officers and an investigator participated in the interrogation. At approximately 3:30 p.m., one of the officers left, leaving North Brunswick Sergeant Ruvolo and Investigator Charles Clark. Lieutenant Mozgai took over the interrogation of defendant later in the evening and Detective Clark stepped out. Each officer testified about his interrogation of defendant, but no recording was made, and Sergeant Ruvolo, the

only officer who participated in the entire interrogation, was not produced at trial because he had retired and moved to Florida.

Detective Clark described the first three hours of the interrogation as a light conversation about issues such as defendant's "Reverend status," cooking, and what defendant had been doing in recent days. He said defendant was oriented to time and place and that he never requested an attorney or to speak with family members. Defendant and one of the officers smoked cigarettes throughout this period. The information the officers received from defendant during the first three hours of the interrogation was "unremarkable."

At approximately 5:00 p.m., three hours after the beginning of the interrogation, Detective Clark asked defendant why his fingerprints were found in the victim's trailer. Defendant repeatedly denied that he had been in the trailer. After being asked a third time—and with Clark staring at him—defendant stated that a week earlier he had accepted the invitation of "Rose," the victim, to come into her house. Clark testified that that statement was significant because Clark had not previously named the victim, because defendant changed his story by admitting that he was in the trailer, and because Clark had been told that very few people ever visited the victim's trailer. Clark eventually challenged defendant's story and accused him of lying.

According to Clark, defendant admitted he had been in the trailer the morning of the murder and then began to sob. Defendant allegedly told Clark that he approached the victim while she was outside watering her flowers, that she invited him inside and offered him a soda, that he discussed religion with the victim and used the bathroom, and that he then left the trailer. When Clark again accused him of lying, defendant again changed his story, this time admitting that he was in the victim's trailer the afternoon of the murder, apparently after Simmons' lunchtime visit. Clark again accused defendant of lying, and defendant then "just looked at [Clark] for a while and put his head down again." Between

5:00 and 6:00 p.m., defendant was allowed to use the restroom under the supervision of police officers.

After 6:00 p.m., over four hours into the interrogation, Clark confronted defendant with the statement of McMenemy. Defendant denied that he ran from the victim's trailer into his own. According to Clark, he also confronted defendant with information he obtained from investigators who returned from canvassing the victim's and defendant's neighborhood. Specifically, Clark told defendant that the investigators learned that on the evening of the murder defendant told a neighbor that the victim was found lying in a pool of blood, dead from stab wounds. Defendant claimed to have heard that information from someone in his driveway.

At approximately 8:30 p.m.—about six-and-a-half hours into the interrogation—Clark stared at defendant "for a minute," stood up, and "hollered ... that he was hiding behind his Reverend status; that only God forgives sinners and not liars." Clark then "stormed out the door and slammed it." Soon thereafter, defendant was given dinner—two hamburgers, french fries, and a soda from a fast-food restaurant. With dinner over, Clark left the interrogation room, and Sergeant Ruvolo and Lieutenant Frank Mozgai of the North Brunswick Police Department resumed the interrogation of defendant.

According to Mozgai, he and defendant "stared at one another for a good portion of time." Mozgai was familiar with defendant's mental health history. Ruvolo and Mozgai noted that they had sons that were defendant's age and Mozgai told defendant that "people don't like to tell lies but sometimes they do." While Mozgai was interrogating defendant, defendant was at times "weeping" and at other times engaged in "normal conversation." When asked to describe the events leading up to the confession, Mozgai answered as follows:

> We were in the area of his history of family problems in life and the lifestyle that he was raised in, how this probably, you know, had an effect on where he was in life today, the trouble he's gone through, you know, the institutions he's been in. Things like that. And he seemed to be crying and weeping more so at this point than prior contact that I was with him [sic] and that, you know, we're trying to

impress upon him, Rich, you just can't carry this with you. This is a heavy thing to carry for the rest of your life, you know, and it's a heavy way to go through life because you're going to live a miserable life probably. That's a lot of weight, you know, for a guy like you to carry. You know, we're telling him basically we don't believe him. We believe he did it, you know, and we should get it over with tonight. Get it over with tonight. Everybody was of the same opinion.... [I]t seemed like his concern was that he didn't want to go to jail. And we told him we understood that. We understood that he didn't want to go to jail. Nobody really wants to go to jail.

. . .

We told him, you know, he would probably need psychiatric help from what we can see in your past history and I agreed that he had a track record in that area of where he has psychological type problems and he was saying that he wants to go to a hospital instead of jail and we kept on saying we can understand that. We could understand that.

. . .

If he needs help, they'll see he gets the help. And we tried to impress upon him the concern that we had that if he in fact was the right person that we were talking to that he should come forward and own up to it because if he stayed out there this was liable to happen again. He didn't want it to happen again and we don't want it to happen again.

While crying—and after almost nine hours of interrogation—defendant told the officers that he had stabbed the victim in the neck. Mozgai then told Clark about defendant's confession, and Clark returned to the interrogation room and led defendant through a detailed confession, the only recorded statement of defendant from the interrogation.

Clark again read defendant his *Miranda* rights. Defendant told Clark that he was riding his bike when he saw Rose, the victim, watering the plants outside her house. According to defendant, after he introduced himself, she invited him inside her house for a soda. Inside, defendant used the victim's bathroom and then asked her if she wanted to have sex with him. Defendant claimed that when she refused his request, he threatened her with a knife and sexually assaulted her. Defendant claimed that he did not wear a condom and that he ejaculated inside the victim.[1] In order to escape detection, defendant stabbed the

---

[1] It may be that improvements in DNA technology could better determine whether the semen found in the victim's body was that of defendant. See *State*

victim in the neck, fled to his trailer, and washed his shirt. Defendant then went to a swimming pool. Upon returning home from there, defendant cooked "rigatellis" with tomato sauce. That evening, defendant observed the arrival of the coroner and the police. The next day, defendant went to an amusement park. The day after the trip, defendant went fishing at Farrington Lake. He stated that after breaking it in half with his bare hands, he threw the murder weapon, a four-inch folding knife, into the lake.

Defendant was charged with second-degree possession of a weapon for an unlawful purpose, second-degree burglary, first-degree aggravated sexual assault, purposeful or knowing murder by his own conduct, felony murder, and third-degree hindering apprehension. The State chose to prosecute defendant capitally.

During a five-week trial, the State introduced, among other evidence, the audio-recorded confession of defendant; the testimony of McMenemy that he saw defendant walk quickly from near the victim's trailer into his own; testimony of the medical examiner that the victim's wounds would have caused spurting blood; testimony of neighbors of defendant regarding defendant's statements the night of the murder that, according to the State, revealed that defendant had detailed knowledge of the crime; shoes taken from defendant's room that could have left an imprint found on the victim's back; hair samples from the crime scene, none of which matched defendant's hair; testimony from a forensic psychiatrist that defendant was manipulative, had the capacity to waive voluntarily his *Miranda* rights, and was in control of the interrogation even though he appeared malleable.

In his defense, defendant denied that he committed the crime, claimed he fabricated his confession to appease the investigators, and argued that it was more likely that the victim's boyfriend, John Simmons, was the perpetrator. Defendant relied on the following evidence in support of those contentions: testimony from

*v. Harvey,* 151 *N.J.* 117, 699 *A.2d* 596 (1997) (explaining varied methods of DNA testing).

a psychologist, Dr. Richard Ofshe, an expert in interrogations and false confessions, who testified that the interrogation of defendant likely resulted in a false confession; testimony that defendant could have overheard details about the crime from officers and police radios while sitting next door at his trailer; testimony about the victim, including that she was reclusive and not likely to invite a person into her trailer, contrary to defendant's statement that he had been invited by her into her trailer; testimony from a scuba diver/police officer that for a four day period up to eight divers searched Farrington Lake, into which defendant claimed to have thrown the knife he broke in half with his hands, without finding either part of the knife; testimony tending to inculpate Simmons, the victim's boyfriend, including testimony that he recently was named as a beneficiary in the victim's life insurance policy; testimony from McMenemy that although he saw defendant walk quickly from near the victim's trailer and into his own, he did not see any blood on defendant; testimony tending to show that the officers took advantage of defendant's mental illness, and testimony that showed defendant stared, sobbed, and experienced mood swings; the absence of serological evidence that definitively inculpated defendant; expert testimony that although the shoeprint on the victim's back could have been made by the defendant's shoes, it was impossible to state with a reasonable degree of scientific probability that the shoe had in fact made the print; testimony of Theodore Mozer, a forensic scientist with the New Jersey State Police, who examined trace evidence from the scene at the request of the State and concluded that the police recovered "no trace evidence linking the suspect to the victim or crime scene"; testimony of a psychiatrist, Kenneth J. Weiss, M.D., who diagnosed defendant with schizoaffective disorder and who concluded that defendant suffered a progressive deterioration in his mental functioning during the interrogation and likely was unable to distinguish between what he knew and what was suggested to him by the interrogators; and testimony from that psychiatrist regarding defendant's severe abuse as a child and his history of institutionalization.

Defendant was convicted by a death-qualified jury of all charges except burglary, which was never submitted to the jury. The jury chose not to sentence defendant to death. The trial court sentenced defendant to an aggregate of two life terms of imprisonment with fifty-five years of parole ineligibility.

In an unpublished *per curiam* opinion the Appellate Division upheld defendant's convictions and sentences, finding that no flagrant police conduct had occurred and that defendant was not subjected to the degree of psychological pressure necessary to require suppression of the confession. Although the Appellate Division found that probable cause was lacking throughout the interrogation, it held that "the long time delay between defendant's arrest and his confession had the effect of attenuating the connection between the two." Without finding any intervening circumstances between the arrest and the confession, the Appellate Division found that the passage of time before the confession purged the taint of the illegal arrest, thus making the confession admissible as evidence of defendant's guilt.

Defendant challenges the admission of his confession as violative of the Fourth, Fifth, and Sixth Amendments of the federal constitution and the similar provisions of the New Jersey Constitution. He contends that his confession should be excluded because he was arrested without probable cause, that his confession is false, unreliable, and involuntarily given, and that the police officers suggested details of the crime to him. He also argues that his conviction is against the weight of the evidence, challenges evidentiary rulings by the trial court, and challenges his sentence.

## II

At common-law, and pursuant to state and federal constitutional principles, police are subject to restraints in the exercise of their arrest and interrogation powers. *State v. Johnson*, 118 *N.J.* 639, 650, 573 *A.*2d 909 (1990). "Police may not arrest someone on a mere whim or suspicion. Neither may they coerce, either through physical abuse or oppressive interrogation, someone to testify

involuntarily against himself or herself." *Id.* at 650–51, 573 *A.2d* 909. A violation of those rights is "a breach of the basic compact between the people and the state" that is redressed by the exclusion of the illegally-obtained evidence. *Id.* at 651, 573 *A.2d* 909 (citations omitted). "The purpose of the exclusionary rule is to deter police misconduct and to preserve the integrity of the courts." *Ibid.* (citations omitted).

"As a general rule, a confession obtained through custodial interrogation after an illegal arrest should be excluded unless the chain of causation between the illegal arrest and the confession is sufficiently attenuated so that the confession was 'sufficiently an act of free will to purge the primary taint.'" *State v. Worlock,* 117 *N.J.* 596, 621, 569 *A.2d* 1314 (1990)(quoting *Wong Sun v. United States,* 371 *U.S.* 471, 486, 83 *S.Ct.* 407, 416–17, 9 *L.Ed.2d* 441, 454 (1963)). "Ultimately, the determination whether the evidence is the 'fruit' of the illegal conduct is a factual matter for the court." *Johnson, supra,* 118 *N.J.* at 653, 573 *A.2d* 909 (citing *Brown v. Illinois,* 422 *U.S.* 590, 604 n. 10, 95 *S.Ct.* 2254, 2262 n. 10, 45 *L.Ed.2d* 416, 427 n. 10 (1975)). In considering whether evidence must be excluded, we have employed the three-part test promulgated in *Brown,* "not because we are bound to follow it, but because we have elected to receive the benefit of its guidance." *Ibid.* (citing *Michigan v. Long,* 463 *U.S.* 1032, 1041, 103 *S.Ct.* 3469, 3476, 77 *L.Ed.2d* 1201, 1214 (1983)).

In *State v. Barry,* 86 *N.J.* 80, 429 *A.2d* 581, *cert. denied,* 454 *U.S.* 1017, 102 *S.Ct.* 553, 70 *L.Ed.2d* 415 (1981), we explained how the *Brown* factors should be evaluated:

> The inquiry for determining whether a defendant's statements are tainted by antecedent illegality is ... a question of judgment. Considering the purposes of the exclusionary rule in these matters (deterrence of illegal arrests and preservation of the integrity of the judiciary) and the competing purpose of discovering the truth in a criminal trial, the court is required to make a value judgment by considering *three factors* as they relate to those purposes: *the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.*

[*Id.* at 87, 429 *A*.2d 581 (citing *Brown, supra,* 422 *U.S.* at 603–04, 95 *S.Ct.* at 2261–62, 45 *L.Ed.*2d at 427 (emphasis added)).]

We turn now to consider individually each of those factors.

### A

The length of time between the unlawful arrest and the confession, the temporal-proximity factor, "may be ambiguous [and] is the least determinative." *Worlock, supra,* 117 *N.J.* at 623, 569 *A*.2d 1314 (citations omitted):

Although a confession given shortly after an arrest may result from pressures generated by the shock of detention, it may also result from considerations unrelated to the arrest. The cause of the confession following a lengthy detention is similarly ambiguous. A long detention may cause a defendant to forget the shock of the initial arrest or it may compound the taint of the confession.

[*Ibid.* (citing *Dunaway v. New York,* 442 *U.S.* 200, 220, 99 *S.Ct.* 2248, 2260–61, 60 *L.Ed.*2d 824, 841 (1979)(Stevens, J., concurring)).]

"If there are no relevant intervening circumstances, a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one." *Dunaway, supra,* 442 *U.S.* at 220, 99 *S.Ct.* at 2260–61, 60 *L.Ed.*2d at 841 (Stevens, J., concurring). *See also People v. Austin,* 293 *Ill.App.*3d 784, 228 *Ill.Dec.* 42, 688 *N.E.*2d 740, 743 (1997) (stating that passage of time alone is not sufficient to purge taint of illegal arrest). Professor LaFave has observed that

in practice the temporal proximity factor has not itself been at all significant as far as influencing a finding that the taint of the illegal arrest was dissipated. Though the short time lapse between arrest and confession is often relied upon in support of a holding that the confession *is* tainted, lapse of time in itself cannot make a confession independent of an illegal arrest.

[5 Wayne R. LaFave, *Search and Seizure* § 11.4(b) at 259–60 (3d ed.1996) (citation and quotation marks omitted).]

The application of the temporal-proximity factor has led to the exclusion of evidence obtained after both long and short illegal detentions. *See Taylor v. Alabama,* 457 *U.S.* 687, 694, 102 *S.Ct.* 2664, 2669, 73 *L.Ed.*2d 314, 321 (1982)(excluding confession obtained fourteen hours after illegal arrest where defendant was in police custody, unrepresented by counsel, questioned on several occasions, fingerprinted, and subjected to a lineup); *Brown, su-*

pra, 422 *U.S.* at 605, 95 *S.Ct.* at 2262, 45 *L.Ed.*2d at 427 (excluding confession obtained two hours after illegal arrest); *Johnson, supra,* 118 *N.J.* at 654, 573 *A.*2d 909 (excluding confession and finding Appellate Division erred in relying on ten-hour length of detention to find lack of temporal proximity). *Cf. Worlock, supra,* 117 *N.J.* at 623, 569 *A.*2d 1314 (finding that temporal-proximity factor weighs in favor of admission of confession following illegal arrest and forty-five minute interrogation where atmosphere surrounding interrogation was relaxed).

■ The conditions of detention should be considered along with the temporal proximity of the confession and arrest and "can be as important as the temporal proximity." *Worlock, supra,* 117 *N.J.* at 623, 569 *A.*2d 1314. "A congenial atmosphere can neutralize the assumption that a confession given after a short period of detention is the product of an illegal arrest." *Ibid.* (citing *Rawlings v. Kentucky,* 448 *U.S.* 98, 107–08, 100 *S.Ct.* 2556, 2563, 65 *L.Ed.*2d 633, 643–44 (1980)).

B

"Intervening events, which serve as objective indications that the causal connection between the arrest and confession has been broken, can be the most important factor in determining whether a confession is tainted. Identifying an intervening circumstance, however, can be difficult." *Worlock, supra,* 117 *N.J.* at 623, 569 *A.*2d 1314. *See generally,* LaFave, *supra,* § 11.4(b) at 263–71 (discussing when intervening circumstances have purged taint of illegal arrests).

■ The presence or absence of *Miranda* warnings should be considered in determining whether a confession is obtained by exploitation of an illegal arrest, but "such warnings are not always sufficient to 'break ... the causal connection between the illegality and the confession.'" *Worlock, supra,* 117 *N.J.* at 622, 569 *A.*2d 1314 (quoting *Brown, supra,* 422 *U.S.* at 603, 95 *S.Ct.* at 2261, 45 *L.Ed.*2d at 427). "Satisfying the Fifth Amendment is only the

'threshold' condition of the Fourth Amendment analysis required by Brown." *Dunaway, supra,* 442 *U.S.* at 219, 99 *S.Ct.* at 2260, 60 *L.Ed.*2d at 840. "If Miranda warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted." *Brown, supra,* 422 *U.S.* at 602, 95 *S.Ct.* at 2261, 45 *L.Ed.*2d at 426.

"[C]lear evidence that before his arrest [a] defendant intended to turn himself in and confess is sufficient to show that 'the confession was not obtained by exploitation of the illegal arrest,'" *Worlock, supra,* 117 *N.J.* at 624, 569 *A.*2d 1314 (quoting *People v. Emanuel,* 98 *Mich.App.* 163, 295 *N.W.*2d 875, 882 (1980)), and removes the specter of egregious police conduct. In the face of egregious police conduct, however, "the State should show some 'demonstrably effective break in the chain of events leading from the illegal arrest to the statement, such as actual consultation with counsel or the accused's presentation before a magistrate for a determination of probable cause.'" *Id.* at 623–24, 569 *A.*2d 1314 (quoting *Brown, supra,* 422 *U.S.* at 611, 95 *S.Ct.* at 2265, 45 *L.Ed.*2d at 432 (Powell, J., concurring)).

In *Barry, supra,* 86 *N.J.* at 89–90, 429 *A.*2d 581, this Court admitted a confession that followed an illegal arrest and a six-hour detention because a co-conspirator implicated the defendant before the defendant confessed and because, prior to the confession, the police presented the confessions of defendant's co-conspirators and physical evidence of the crime to the defendant. *Ibid.* Other "intervening circumstances" that have been held to remove sufficiently the taint of an illegal arrest include a defendant's confession in response to the first question posed to him, *Worlock, supra,* 117 *N.J.* at 624, 569 *A.*2d 1314; the termination of the illegal custody, *Wong Sun, supra,* 371 *U.S.* 471, 83 *S.Ct.* 407, 9 *L.Ed.*2d 441; and a volunteered statement not made in response to police interrogation, *United States v. Houle,* 620 *F.*2d 164, 165 (8th Cir.1980)(finding intervening circumstance where officer overheard defendant confess to cellmate). *Cf. Johnson, supra,* 118

*N.J.* at 657–58, 573 *A.*2d 909 (finding that escape from custody was not intervening event when defendant was denied access to counsel after repeated requests); *Taylor, supra,* 457 *U.S.* 687, 691, 102 *S.Ct.* 2664, 2667–68, 73 *L.Ed.*2d 314, 320 (finding that visits with girlfriend and another friend were not intervening circumstances). The presentation of a defendant before a judge who determines that probable cause exists to hold a defendant may purge the taint of an illegal arrest, *Johnson v. Louisiana,* 406 *U.S.* 356, 365, 92 *S.Ct.* 1620, 1626, 32 *L.Ed.*2d 152, 161 (1972)(finding intervening circumstance where defendant was brought before committing magistrate who advised him of his rights and set bail), but the mere issuance of an arrest warrant based on tainted evidence will not, *Taylor, supra,* 457 *U.S.* 687, 692–93, 102 *S.Ct.* 2664, 2668, 73 *L.Ed.*2d 314, 320–21 (finding issuance of arrest warrant not intervening circumstance because filed *ex parte* based on comparison of defendant's fingerprints found at scene of crime with fingerprints taken immediately after defendant's arrest).

## C

■ The third and final factor is the purpose and flagrancy of the police misconduct, which "is 'particularly' relevant to determining whether a confession is the 'fruit' of [the illegal] arrest." *Worlock, supra,* 117 *N.J.* at 624, 569 *A.*2d 1314 (quoting *Brown, supra,* 422 *U.S.* at 604, 95 *S.Ct.* at 2262, 45 *L.Ed.*2d at 427). That factor requires consideration of the manner in which the defendant was arrested, detained, and interrogated. In *Brown,* the United States Supreme Court suppressed a confession where "the impropriety of the arrest was obvious" and the arrest was "calculated to cause surprise, fright, and confusion." 422 *U.S.* at 605, 95 *S.Ct.* at 2262, 45 *L.Ed.*2d at 428. *See also Johnson, supra,* 118 *N.J.* at 658–59, 573 *A.*2d 909 (excluding confession due to illegal arrest and repeated denial of counsel). In his discussion of flagrant police conduct that required exclusion of confessions, Professor LaFave observes that

it appears that if a particular arrest is undertaken upon evidence which falls short of probable cause more than slightly, and if its purpose is the obtaining of a

statement and it is exploited to that end, then the chances are that the confession thereafter obtained will have been "tainted" by the illegal arrest.... Taint has been found, for example, when the arrest was made without any apparent justification, as part of a dragnet operation, or upon a pretext. Similarly, courts have suppressed confessions where it appeared that the illegal arrest was for the purpose of obtaining a confession and where the arrest was exploited for that purpose, as by misleading the arrestee as to the purpose of the arrest, subjecting [the arrestee] to continuous interrogation, or threatening [the arrestee] with a lie detector test.

[LaFave, *supra*, § 11.4(b), at 261–62 (quotation marks omitted).]

Although the presence of physical abuse militates in favor of exclusion of a confession, the absence of physical abuse does not require admission of a confession. "The rights of the public to be free from the unwarranted use of power by law-enforcement officials would be in a sorry state if evidence obtained in violation of a citizen's constitutional rights were admissible merely because the citizen had not been subjected to physical abuse." *Johnson, supra,* 118 *N.J.* at 659–60, 573 *A.*2d 909.

### III

█ Defendant contends that his confession should be excluded because it is the unattenuated product of his illegal arrest. The State argues in response that the confession was temporally remote from the illegal arrest, that probable cause arose during the interrogation, and that defendant was well treated during the interrogation. To resolve this matter, we consider the three factors in the order of their determinativeness on the issue of attenuation.

Regarding the purpose and flagrancy of the police misconduct, that the arrest and interrogation of defendant violated defendant's rights guaranteed by Article I, Section 7 of the New Jersey Constitution and the Fourth Amendment to the United States Constitution is not disputed. The State concedes that defendant was arrested without probable cause. Beyond that initial violation of defendant's rights, the State asserts that defendant was well treated. Because all but the final minutes of defendant's nine-hour interrogation were unrecorded, we are left to glean the

details of the interrogation from the conflicting testimony proffered by defendant and the State.

Although the State acknowledges that one investigator yelled at defendant, it notes that during the interrogation defendant ate dinner and smoked cigarettes, was permitted to visit the restroom, and at times engaged in light conversation with his interrogators. Defendant alleges that the efforts of his mother to obtain legal representation for defendant were met with lies by the police, including statements that defendant was not a suspect and that he did not need a lawyer. Through his experts, defendant alleged that he was physically and verbally abused, that he requested a lawyer, that he requested that the interrogators stop the interrogation, that his mistreatment led him to confess falsely, and that he was told he would be sent to a mental hospital instead of a prison, a fact that was corroborated partly by Lieutenant Mozgai. Although defendant's recollection of the interrogation was discredited substantially by the trial court, we are troubled by the allegations that defendant's mother was dissuaded from obtaining legal representation for her son. Thus, whereas the conditions of defendant's arrest clearly militate in favor of suppression, the conditions of his interrogation are at best neutral and at worst tilt in favor of suppression of his confession.

Regarding the presence of intervening factors, the State claims that new information obtained during defendant's interrogation, relating to defendant's knowledge on the evening of the crime about the victim's condition, constituted an intervening circumstance by providing probable cause for the continued interrogation of defendant. The State contends that police officers independently learned that on the evening of the murder defendant told a neighbor that the victim was found dead from stab wounds and was lying in a pool of blood. According to the State, defendant's possession of that information about the murder, not available to the public, implicated him in the crime. Defendant, however, claimed to have obtained that information while sitting next to the victim's trailer during the commotion following the discovery of

her body. Further, defendant contends that the information was not new at the time of defendant's interrogation. Although the Appellate Division characterized the information as new, it held that the increased quantum of information did not remove the taint of the illegal arrest.

Our review of the record indicates that police investigators likely were aware of defendant's statements regarding the crime scene approximately thirty-two hours before he was arrested. According to Lieutenant Mozgai, police officers canvassed defendant's neighborhood the morning after the murder. Sergeant Ruvolo spoke with Barbara Traube and Leonard Falabella, neighbors of defendant, at 6:00 a.m. on July 24, but no notes or recording of that interview was proffered by the State. At trial, after testifying about defendant's statements, Traube testified that when she was interviewed that morning she "thought it was peculiar that [defendant] would mention something like that to [her] (referring to victim lying dead in a pool of blood), so [she] said something to the police officer." She further testified that she told the police officers that morning "some of the things" about which she testified at trial, another obvious but imprecise reference to defendant's alleged inculpatory statements.

At around 5:00 p.m. on July 25, while defendant was being interrogated, Mozgai, who was one of the arresting officers, and another officer, conducted and recorded a second interview of Traube and Falabella. During that interview, both Traube and Falabella reported that soon after the victim was discovered, and while police were still in the vicinity of the victim's trailer, defendant told them that the victim was found lying in a pool of blood, dead from stab wounds. Both neighbors also reported that defendant stated that he heard that information on police radios near the crime scene shortly after the discovery of the victim. In short, neither Traube's nor Falabella's testimony could fairly be understood to exclude the likelihood that the police had learned about defendant's statement concerning the victim's body before the second interview of Traube and Falabella. Rather, the testi-

mony of Traube suggests that she told the police investigators about defendant's statements the day before defendant's arrest. The bare allegation by the State to the contrary is unpersuasive.

However, even if the information was new, we find that the discovery of defendant's statements about the crime scene did not constitute an intervening circumstance sufficient to erase the taint of the illegal arrest. To introduce a confession obtained after an illegal arrest, "the State should show some 'demonstrably effective break in the chain of events leading from the illegal arrest to the statement, such as actual consultation with counsel or the accused's presentation before a magistrate for a determination of probable cause.'" *Worlock, supra,* 117 *N.J.* at 623–24, 569 *A.*2d 1314 (quoting *Brown, supra,* 422 *U.S.* at 611, 95 *S.Ct.* at 2265, 45 *L.Ed.*2d at 432 (Powell, J., concurring)). Here, even if the allegedly new information could constitute probable cause, the existence of probable cause was not found by a judge, and defendant had no time to himself free from the pressure of the interrogation. Rather, from his arrest to his confession, he was in custody and in the presence of police officers. He spoke with neither family nor counsel. The eleventh-hour discovery by police officers of allegedly new information, which could have been—and in all likelihood was—acquired a day earlier is a weak reed on which to rest the State's claim of intervening circumstances. In our view, the causal chain between defendant's arrest and confession essentially was unbroken.

Regarding the temporal-proximity factor, the Appellate Division found that "any taint from the arrest was purged by the long period that elapsed before defendant confessed." We have noted before that the impact of the temporal-proximity factor "may be ambiguous [and] is the least determinative" and that "[a] long detention may cause a defendant to forget the shock of the initial arrest or it may compound the taint of the confession." *Worlock, supra,* 117 *N.J.* at 623, 569 *A.*2d 1314 (citing *Dunaway, supra,* 442 *U.S.* at 220, 99 *S.Ct.* at 2260–61, 60 *L.Ed.*2d at 841 (1979)(Stevens, J., concurring)). In this case, however, the tempo-

ral-proximity factor is unpersuasive. The mere passage of time ordinarily does not purge the taint of an illegal arrest. *Ibid.* *See also Austin, supra,* 228 *Ill.Dec.* 42, 688 *N.E.*2d at 743 (stating that passage of time alone is not sufficient to purge taint of illegal arrest). In the absence of intervening circumstances, the nine-hour interrogation of defendant exacerbated the illegality of his detention and thus militates in favor of suppression. *See Dunaway, supra,* 442 *U.S.* at 220, 99 *S.Ct.* at 2260–61, 60 *L.Ed.*2d at 841 (Stevens, J., concurring)("If there are no relevant intervening circumstances, a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one."). A contrary rule would encourage police officers who arrest without probable cause to conduct lengthy interrogations in an effort to purge the unlawful arrest of its unconstitutional taint.

Because defendant was illegally arrested and interrogated, and because there is an unbroken causal connection between his arrest and confession, we hold that the defendant's confession must be suppressed.

IV

In view of our suppression of defendant's confession as the product of an illegal arrest, we need not consider defendant's other contentions. The judgment of the Appellate Division is reversed, and the matter is remanded to the Law Division for retrial.

*For Reversal and Remandment*—Chief Justice PORITZ and Justices O'HERN, STEIN, COLEMAN, LONG, VERNIERO and LaVECCHIA—7.

*Opposed*—None.