**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2254-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JERMAINE SANDERS,

    Defendant-Appellant.

_____

Submitted November 12, 2025 – Decided February 20, 2026

Before Judges Susswein and Augostini.

On appeal before the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 05-04-1004.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Lee March Grayson, Designated Counsel, on the brief).

Theodore N. Stephens, II, Essex County Prosecutor, attorney for respondent (Hannah Faye Kurt, Assistant Prosecutor, of counsel and on the brief).

Appellant filed a supplemental brief on appellant's behalf.

PER CURIAM

This post-conviction relief (PCR) matter returns to us following a remand for an evidentiary hearing for "the PCR court [to] explore whether the [police] . . . testified falsely, and whether there is a reasonable probability that the outcome of the trial would have been different had the State timely disclosed the [communications data warrant (CDW)] materials." State v. Sanders (Sanders II), No. A-5121-17 (App. Div. June 15, 2021) (slip op. at 3). After reviewing defendant's arguments in light of the evidentiary hearing record and according deference to the second PCR judge's factual findings, we affirm substantially for the reasons explained in the PCR judge's sound written opinion.

I.

We presume the parties are familiar with the facts detailed in our prior opinions; therefore, we limit our recitation of the facts to the issues raised in this appeal. Following a fourteen-day jury trial, defendant was convicted of knowing/purposeful murder, felony murder, conspiracy, aggravated assault, and multiple carjackings, armed robberies, and weapons offenses.

In defendant's first PCR appeal, we summarized the trial testimony that led to the charges against defendant:

> According to the State's evidence, defendant and
> two co-defendants, Hafiz Josey and Quawee Jones,

2

engaged in a crime spree that began in the early morning hours of July 3, 2004.

The spree started after Kendall Blake and Damian Clark left a bar on Mount Prospect Place at around 2:30 a.m. As they entered their car, an "ice bluish" Grand Cherokee Jeep with tinted windows cut them off and two men with guns alighted and approached the driver and passenger's sides. Blake and his friend were ordered at gunpoint to exit their car and lay on the ground. Blake testified one man went through his pockets and told him he was "going to die tonight." But police sirens sounded, and the two men fled, taking Blake's wallet and Clark's wallet, phone, and watch.

The next victim was Andrew De Souza. He was in his car at 16th Avenue and South 19th talking with a woman when he heard yelling. The woman ran to the rear of his car. Someone approached with an automatic handgun, pointed it at De Souza, and ordered him out. De Souza complied, then pushed the gunman and began to run when he was shot from behind. De Souza recalled seeing a dark colored Jeep Cherokee with tinted windows.

Between 3:15 and 3:30 a.m., Tiking Wallace-Wilson arrived at an apartment building to pick up a friend. Seconds after he stopped, a blue Jeep Cherokee pulled in front of him, and two men with guns exited and ordered Wallace-Wilson out of his Mercedes. They took his wallet and drove off in his car.

The crime spree continued. Shortly before 5 a.m., Jacque Thelemaque left a club and entered his black Lexus. As he opened the car door, a man with a gun demanded Thelemaque turn over the car keys. Then, a blue Jeep Cherokee pulled up in front of his car,

3

boxed him in, and Thelemaque turned over the keys and cell phone.

Also, around 5 a.m., Alejandro Okoraogu-Loren was waiting at a red light on Elizabeth Avenue when a greenish-blue Jeep Cherokee cut him off and two armed men jumped out of the car. One of them ran to the driver's side of his car, put a gun to Okoraogu-Loren's neck, and demanded he and his passenger get out of the car. The two drove off with his car after taking his cell phone and a DVD player.

Then the crime spree took a deadly turn. At around 5:20 a.m., Marquise Carter, Jr., was shot to death. The Medical Examiner testified Carter suffered three gunshot wounds, one in his head, one in his neck, and one in his back.

But [] there were two more victims. Andre Rossignol was driving his taxicab around 5:45 a.m. when a blue Jeep Cherokee parked in front of him. Two men got out and approached his car. He tried unsuccessfully to shut his door. One of the men got in the car and aimed a gun at him. They took all of Rossignol's money and then returned to the Jeep and fled. Rossignol chose defendant's picture from a photo array when he gave police a statement[] but did not identify defendant at trial.

Around 6:30 a.m., Josefina Rosa was driving her Lexus when a gunman left a blue Jeep, approached her window, and demanded money. When she said she had none, he ordered her out of her car. He took her driver's license and cell phone[] and then drove off in her car.

The [Essex County Prosecutor's Office (ECPO)] detective testified he applied for a [CDW] during July 4th weekend for the cell phones the robbers stole. He

4

said he received results within a day or two. The detective learned that Okoraogu-Loren's phone was still being used after the robbery. Based on the detective's reading of the phone records, two teams were sent to two addresses, including defendant's mother's house. After speaking with defendant's mother, one team then went to an apartment where defendant lived with his girlfriend. The police knocked on the door, and defendant fled out a back window. However, the police searched the apartment and found incriminating pieces of evidence in plain view, including: a loaded .45 caliber revolver; cell phones; Thelemaque's vehicle registration and insurance identification card; and Rosa's driver's license.

The ECPO captain confirmed the detective's version of events. He testified that he, the detective, and other law enforcement officers huddled once they had the CDW return in hand. The captain was part of the team that went to the defendant's girlfriend's house and discovered the murder weapon and other stolen items.

Police arrested defendant two days after the seizure and charged him with unlawful possession of a handgun. Hours after being arrested, defendant gave police two statements, admitting he, Josey, and Jones were involved in the robberies and Carter's murder.

Pre-trial, defendant moved unsuccessfully to suppress his statements and the evidence seized from his girlfriend's apartment. After an extended trial, defendant was convicted of most counts of the indictment.

[Sanders II, slip op. at 3-7.]

On direct appeal, we affirmed defendant's convictions and the orders denying defendant's suppression motions. See State v. Sanders (Sanders I), No. A-2219-08 (App. Div. December 19, 2012). However, we remanded for resentencing. Id. at 49.

Defendant filed a timely self-represented PCR petition seeking relief on various grounds, arguing ineffective assistance of counsel. PCR counsel moved for a new trial and for a change of venue for the PCR matter. At oral argument, PCR counsel renewed the request made in his brief for the State to produce the CDW and the documents obtained as a result thereof. During the argument, the State turned over the CDW materials for the first time, conceding that these documents were discoverable. The first PCR judge denied relief without an evidentiary hearing along with defendant's other motions, and an appeal followed.

On June 15, 2021, we remanded the case for an evidentiary hearing for the second PCR judge to explore the date discrepancy between law enforcement testimony regarding when the subscriber information from the CDW was received and the date of the fax cover sheet from the provider. We instructed the second PCR judge to determine: (1) "whether, if the physical evidence had been wrongfully seized, there is a reasonable probability the result of the trial

6

would have been different," and (2) "if there is a reasonable probability that the impeachment would have altered the result of the Miranda[1] hearing, and in turn, altered the result of the trial itself." Sanders II, slip op. at 26-27.

On May 18, 2023, the second PCR judge conducted an evidentiary hearing. Sergeant Christopher Smith, the only witness, testified on behalf of the State. During the evidentiary hearing, the State introduced the CDW, fax cover sheets and subpoenas, and subscriber history (telephone records) which had been turned over during the first PCR hearing. Smith explained that the CDW was signed by a judge on July 4, 2004, permitting them to obtain information from Nextel about the phone numbers, the inbound and outbound calls, and subscriber information for the victims' phones. The CDW was served upon Nextel via fax. However, Smith was unable to find the fax cover sheet after going through the file.

Smith explained that twenty years ago when this investigation was being conducted, a more informal process existed for gathering cell phone information. He testified that at that time, "[it] was new for us using [cell phone information] as an investigative tool and for the cell companies to provide us information, any information we were asking for." He further explained, "[w]e

---

[1] Miranda v. Arizona, 384 U.S. 436, 478-79 (1966).

A-2254-23

would serve the CDW or a subpoena, some sort of legal process, and we would be able to call the phone company, almost immediately sometimes, and they would provide us the information once they received the legal process. They would provide us with information telephonically."

Smith recalled speaking with a Nextel representative telephonically concerning the CDW prior to July 7, 2004. He was provided subscriber information and phone numbers associated with outbound calls made from the cell phone after the robbery took place. He confirmed it was the victim's phone. Smith wrote down the phone numbers as provided by the Nextel representative. Smith no longer had those notes.

The State presented the cell phone records and subscriber information for the relevant phone number provided in response to the CDW. While going through the file, Smith was unable to locate fax pages one, three, or seven. He could not explain why none of the subpoenas were signed, why he did not have proof of service for them, and could not explain what happened to the missing subpoena documents. Although he was unable to recall what was on those pages, he testified they were most likely similar to the other records' pages that he did find. Smith testified that the date stamp of September 10, 2004 on the fax cover sheet indicated that Nextel sent the records to him on that date.

8

Smith explained the discrepancy between the date of defendant's arrest and the date on the fax sheet was due to the informal process at that time. He testified that in 2004, with the process being less formal, he was able to fax the order to the cell phone provider and get the information over the phone. According to Smith, he would later receive a hard copy of the information that was conveyed to him over the phone.

The second PCR judge found Smith credible and his explanation for the date discrepancy to be "reliable and reasonable." The judge concluded that the "CDW materials did not negate or eliminate probable cause for law enforcement's seizure of the evidence or arrest of [defendant,]" and further concluded that it did not change the outcome of the suppression motion. Concerning the <u>Miranda</u> hearing, the second PCR judge found that defendant's seizure was "supported by probable cause and did not taint the subsequent custodial statement." Having determined that the physical evidence and confession were properly admitted, the second PCR judge concluded that "it [was] unlikely the CDW would have changed the outcome of the trial" because the evidence against defendant was overwhelming and the CDW information was insufficient to "discredit [] Smith before the jury." The judge denied defendant's PCR petition.

A-2254-23

Defendant appeals, arguing in a counseled brief:

POINT I

THE PCR COURT ERRED BY DENYING POST-CONVICTION RELIEF FOLLOWING THE EVIDENTIARY HEARING BY FINDING THAT THE STATE'S SOLE WITNESS, THE LEAD INVESTIGATING DETECTIVE, WAS CREDIBLE DESPITE OVERWHELMING EVIDENCE TO THE CONTRARY AND BECAUSE THE DETECTIVE FAILED TO PROVIDE A REASONABLE EXPLANATION ABOUT WHY THE SUBSCRIBER HISTORY THAT WAS FAXED TO HIM FROM THE CELL PHONE CARRIER WAS DATE-STAMPED TWO MONTHS AFTER THE DEFENDANT WAS ARRESTED.

POINT II

THE PCR COURT ERRED BY FINDING THAT THE RULINGS IN THE PRETRIAL MOTIONS WERE SOUND AND THE OUTCOME OF THE TRIAL WOULD NOT HAVE BEEN DIFFERENT.

In his supplemental self-represented brief, defendant contends:

POINT I

THE DEFENDANTS STATE CONSTITUTIONAL RIGHTS WERE VIOLATED, ART.1 1 PARA.1, DUE PROCESS, WHEN THE STATE LOST OR DESTROYED THE FAXED COVER SHEET CONFIRMING THE SERVING OF THE COMMUNICATION DATA WARRANT, THREE FAXED PHONE RECORD PAGES, PROOF OF SERVICE FOR THE ALLEGED SUBPOENAS, RETURN OF SERVICE FOR THE SUBPOENAS,

WHICH LED TO THE VIOLATION OF ART.1, PARA.7, A WARRANTLESS SEARCH OF DEFENDANTS RESIDENCE.

II.

A.

PCR "is New Jersey's analogue to the federal writ of habeas corpus." State v. Pierre, 223 N.J. 560, 576 (2015) (quoting State v. Preciose, 129 N.J. 451, 459 (1992)).  PCR provides "a built-in 'safeguard that ensures that a defendant was not unjustly convicted.'" State v. Nash, 212 N.J. 518, 540 (2013) (quoting State v. McQuaid, 147 N.J. 464, 482 (1997)).

"Our review of a PCR court's factual findings" after it conducts an evidentiary hearing "is 'necessarily deferential.'" State v. Hernandez-Peralta, 261 N.J. 231, 246 (2025) (quoting Nash, 212 N.J. at 540).  "An appellate court's reading of a cold record is a pale substitute for a trial judge's assessment of the credibility of a witness he [or she] has observed firsthand." State v. Gideon, 244 N.J. 538, 562 (2021) (quoting Nash, 212 N.J. at 540).  Therefore, when a PCR court conducts an evidentiary hearing, we should "uphold the PCR court's findings that are supported by sufficient credible evidence in the record." Id. at 551 (quoting Nash, 212 N.J. at 540).  However, a PCR court's interpretation of

11

the law is reviewed de novo.  Hernandez-Peralta, 261 N.J. at 246; see also State

v. Harris, 181 N.J. 391, 415-16 (2004).

B.

We begin with defendant's contention that the second PCR judge erred by

finding Smith credible in the face of overwhelming evidence to the contrary.

Defendant asserts five reasons why the second PCR judge erred in crediting

Smith's testimony:

> (1) the CDW materials were faxed to Smith two months
> after defendant's arrest; (2) pages from the subscriber
> history were missing, including the fax cover sheet; (3)
> Smith's handwritten notes from the conversation with
> the Nextel representative were not preserved; (4) none
> of the eleven subpoenas were signed; and (5) no return
> service for the subpoenas was provided.

We discern no error in the judge's rejection of these assertions and assessment

of Smith's credibility.

The second PCR judge detailed her credibility findings regarding Smith,

describing him as "calm, composed and cooperative throughout the hearing,"

and "not evasive," "defensive" nor did he "try to deflect away any questions."

The judge found his explanation regarding the date discrepancy that he called

Nextel, after having received the CDW, and wrote down the requested

information from the stolen phone to expedite the investigation, "reliable and

12

reasonable." Smith clarified that he received the faxed phone records after having obtained the necessary information verbally from the Nextel representative. The judge found that this explanation "clarifie[d] any doubts caused by the date discrepancies."

We review the second PCR judge's credibility findings with great deference. See Pierre, 223 N.J. at 576-77. We are satisfied that the judge's credibility findings were based on sufficient credible evidence in the record. Smith's explanation of the date discrepancy was reasonable in light of this twenty-year-old case and consistent with the practice at that time. As the judge underscored, "as phone usage became more prevalent and widespread, the process evolved and became more formal."

Defendant contends that the second PCR judge erred by crediting Smith's testimony in the face of the State's failure to provide the defense with discoverable materials that could have been used during the pretrial hearings and at trial to impeach Smith's credibility. The second PCR judge did not ignore the State's discovery violation, which the judge found, as do we, "deeply concerning." However, as the judge noted, Smith was not responsible for turning over these documents and did not know why the State did not turn them over.

Concerning Smith's failure to retain his handwritten notes of his conversation with the Nextel representative, defendant argues that these notes "would have shed light on what he really knew during the time of the investigation in July 2004," and that this discovery violation impacted his right to a fair trial. Our Supreme Court in State v. W.B., a case decided after the jury's verdict in this case, held "the time has come to join other states that require the imposition of an appropriate sanction whenever an officer's written notes are not preserved." 205 N.J. 588, 608 (2011) (citations and internal quotation marks omitted). The second PCR judge held:

> [E]ven with the discovery violation—which is indeed very troubling—and even factoring in an adverse inference, the court does not find that the fax discredits Sgt. Smith's credibility.

Thus, the court factored into her decision an adverse inference but nonetheless found Smith's testimony as to the date discrepancy believable. Smith readily acknowledged the missing documents and the lack of explanation for unsigned subpoenas, which the second PCR judge found "reflected[ed] the informality of the process back in 2004." Therefore, we are not convinced that the second PCR judge's credibility determination was clearly mistaken.

14

C.

Defendant next contends that the second PCR judge erred by finding the pretrial suppression rulings were sound and the outcome of the trial would not have been different had the CDW materials been turned over timely. Defendant argues that "[h]ad the discovery been available for trial, there is a reasonable probability that the outcome of the [his] case would have been different, and that [] [he] would have been found not guilty." We disagree.

In our decision regarding the first PCR hearing, we remanded the case because "[a]bsent an explanation for the date discrepancy, the subscriber history indicates that the two law enforcement witnesses who testified at the suppression hearing, the Miranda hearing, and at trial, testified falsely about what they knew and when they knew it." However, based on Smith's testimony and credible explanation for the date discrepancy, the second PCR judge found "the only reason law enforcement went to [defendant's mother's] home was based on the subscriber information received verbally from Nextel through the [validly issued] CDWs." The record clearly supports this finding and no other credible explanation has been offered as to why law enforcement would have gone to defendant's mother's home. As Smith testified, neither he nor his team had any information regarding defendant's mother or defendant before receiving the

15

subscriber information. Then, based on information from defendant's mother, "[l]aw enforcement [] went to [defendant's] girlfriend's home."

Upon arriving at the girlfriend's home, one of the officers saw a male flee out a back window. After entering the residence, the police found incriminating pieces of evidence from the crime spree in plain view. We discern no basis to conclude that the second PCR judge erred in ruling that the factual findings from the evidentiary hearing "negate[d] or eliminate[d] probable cause for law enforcement's seizure of the evidence or [defendant's] arrest."

D.

On remand, we further directed the second PCR judge "to consider whether defendant's confession, obtained in a custodial setting, [was] sufficiently attenuated from the possible illegal arrest to avoid being excluded as the fruit of the poisonous tree." See State v. Chippero, 164 N.J. 342, 353 (2000). We also directed the judge to "determine if there is a reasonable probability that the impeachment would have altered the result of the Miranda hearing, and in turn, altered the result of the trial itself." Having found Smith credible and the probable cause determination sound, the judge properly ruled that the seizure of defendant did not taint his subsequent custodial statement.

In sum, the second PCR judge, in accordance with our remand instructions, conducted an evidentiary hearing, made factual findings and conclusions of law, determining that the physical evidence had not been wrongfully seized and that the discoverable materials were not likely to have changed the outcome of the suppression or <u>Miranda</u> hearings or the trial. Based on the court's factual findings and credibility determination regarding Smith's explanation for the date discrepancy, the court found it "very doubtful the CDW materials would [have been] sufficient to discredit [] Smith before the jury" and therefore unlikely to have changed the outcome of the trial. We are satisfied that nothing in the record substantiates defendant's claim that the proceedings would have been different if the CDW materials had been turned over timely and Smith's notes of his conversation with the Nextel representative had been preserved.

To the extent that we have not addressed any other arguments raised by defendant, we are satisfied they are without sufficient merit to warrant further discussion in a written opinion. <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2254-23