64 A.3d 499

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. DON C. SHAW, DEFENDANT–RESPONDENT.

Argued September 25, 2012—Decided December 13, 2012.

400 

*Jeanne Screen,* Deputy Attorney General, argued the cause for appellant (*Jeffrey S. Chiesa,* Attorney General of New Jersey, attorney).

*Matthew J. Astore,* Deputy Public Defender, argued the cause for respondent (*Joseph E. Krakora,* Public Defender, attorney; *Mr. Astore* and *Frank J. Pugliese,* Assistant Deputy Public Defender, on the brief).

Justice ALBIN delivered the opinion of the Court.

Police officers, who were part of a special task force to apprehend fugitives, arrived at a multi-unit apartment building to execute an arrest warrant just as defendant Don Shaw and another individual were exiting the building. Shaw was held by these officers because he refused to give his name. The officers did not know whether Shaw was the subject of the arrest warrant; the officers did know that Shaw, like the fugitive, was a black man. On the record before us, this is the only descriptive basis for the stop. Minutes later, other law enforcement officers, including a parole officer, came to the scene. The officers determined that Shaw was not the target of the arrest warrant to be executed.

Shaw's name, however, was on a readily available list of those wanted for parole violations. Shaw was arrested, and a search revealed that he had illegal drugs in his possession.

The trial court found that Shaw was the subject of an unreasonable stop in violation of the Fourth Amendment. However, applying the attenuation doctrine, the court declined to suppress the drugs, concluding that the parole warrant served as an intervening circumstance that broke the chain between the improper stop and the discovery of the drugs. The Appellate Division concurred that the police unlawfully detained Shaw, but found that the presence of the warrant did not sufficiently attenuate the taint from the unconstitutional stop. Accordingly, the Appellate Division invoked the exclusionary rule and suppressed the drugs.

We now affirm.

## I.

Shaw was charged in a four-count indictment with third-degree possession of a controlled dangerous substance, namely heroin, *N.J.S.A.* 2C:35–10a(1); second-degree possession of heroin with intent to distribute, *N.J.S.A.* 2C:35–5a(1) and *N.J.S.A.* 2C:35–5b(2); third-degree possession of heroin with intent to distribute on or near school property, *N.J.S.A.* 2C:35–7; and second-degree possession of heroin with intent to distribute on or near a public housing facility, public park, or public building, *N.J.S.A.* 2C:35–7.1.

The issues in this case implicate the constitutionality of the stop of Shaw and the application of the exclusionary rule to evidence seized from him. Shaw moved to suppress evidence that the State intended to offer at his trial. At a suppression hearing, the State presented three witnesses: New Jersey State Police Detective Steve Brown, New Jersey State Parole Officer Dan D'Amico, and Atlantic City Police Officer Steve Palamaro. From their testimony, we learn the following.

## A.

On the evening of June 11, 2011, State Police Detective Brown set out to execute an arrest warrant on a named fugitive who

resided in a multi-unit apartment complex at 507 Tennessee Avenue in Atlantic City. Detective Brown was participating in a program called Operation FALCON, a joint effort by federal, state, and local law enforcement officials to apprehend fugitives. Detective Brown was leading one team of officers. Another team was also in operation that evening. Each team had a list of primary targets—such as the fugitive to be arrested at 507 Tennessee Avenue. However, if participating officers encountered non-primary targets—other fugitives with outstanding warrants, including parole violators—they too would be arrested. Those arrests were to be added to the statistics of Operation FALCON.

That evening, Parole Officer D'Amico—a participant in Operation FALCON—was part of a second team executing separate warrants. D'Amico was in a car with Atlantic City Police Officer Palamaro and Officer Herbert of the Atlantic County Sheriff's Office. D'Amico carried a list of parole warrants for non-primary targets. One name on that list was Don Shaw. He was prepared to arrest Shaw or any other wanted parolee on sight.

At approximately 8:00 p.m., as Detective Brown's team approached 507 Tennessee Avenue, Brown observed two unknown individuals, Shaw and Niam Gardner, exit from the common entrance of the building and walk in different directions. From Detective Brown's perspective, the men parted ways on seeing the police. However, he did not observe either individual engage in criminal activity, nor did he know where they were going or whether they knew each other. Nevertheless, Brown and several detectives stopped Shaw, and other detectives stopped Gardner. Detective Brown had the name and description of the person identified in the arrest warrant, but the only features that Brown could say that Shaw shared in common with the targeted fugitive were that both were black and both were men.[1] Detective

---

[1] Detective Brown did not have a photograph of the fugitive named in the arrest warrant. At the time of the motion to suppress hearing, Detective Brown

Brown's purpose in detaining Shaw and Gardner was to determine whether either one was the fugitive he sought.

In response to Detective Brown's request for his name, Shaw "mumbled something." Detective Brown then repeatedly asked Shaw for his name, but Shaw would not answer. Detective Brown intended to detain Shaw until he learned his identity. His goal was to make certain that Shaw was not "the person that [they] were actually looking for at 507 Tennessee Avenue." Indeed, if necessary, Brown was prepared to "transport [Shaw] from that location to the State Police barracks or somewhere and run him on [the] AFIS system to see if his prints matched the person [they] were looking for." [2]

In the meantime, the second team, which included Parole Officer D'Amico, received a radio call from Detective Brown's unit that an individual had been stopped and was refusing to give his identity. Within minutes, D'Amico and the occupants of his car appeared on the scene. On arrival, Officer Palamaro recognized Shaw and announced his name to the others in his car.[3] Officer D'Amico immediately knew that Shaw was wanted on a parole warrant "because the list was short." Shaw was then handcuffed. A trooper on the scene called "dispatch," confirmed the validity of the parole warrant, and determined the existence of another outstanding warrant for Shaw issued by the Galloway Township Municipal Court.

---

could not recall whether there were any individual characteristics of the fugitive—other than sex and race—that were similar to those of Shaw. No testimony was offered that Gardner matched the description of the fugitive.

[2] AFIS stands for Automated Fingerprint Identification System. *See* New Jersey State Police, *Identification and Information Technology Section, State Bureau of Identification (SBI)*, http://www.njsp.org/divorg/admin/iits.html (last visited Nov. 29, 2012).

[3] Officers Palamaro and D'Amico also recognized Gardner. The record, however, does not reveal whether there was any legal basis to detain or arrest him.

Shaw was arrested and searched. In Shaw's waistband, Detective Brown discovered a plastic shopping bag, and inside the bag, two bricks of heroin wrapped in pornographic paper material. The two bricks of heroin were broken down into 649 individually wrapped smaller bags.

### B.

At first, the trial court suppressed the drugs as the product of an unconstitutional search. It found that "the police did not observe [d]efendant doing anything that would have aroused an objective, articulable suspicion that [d]efendant was engaged in criminal activity." Two men walking out of a multi-family apartment building, and then in opposite directions, "is not overly suspicious behavior." The court also determined that "[d]efendant had a right not to answer" Detective Brown's questions and "that a reasonable person in [his] position would not have felt that he was free to leave." The court observed that "Trooper Brown's statement that he was not going to let [d]efendant leave until they had his information does shed light on the atmosphere surrounding the stop." The court concluded that "the police did not have a reasonable, articulable suspicion to justify the stop" and suppressed the evidence as the product of a search incident to an unlawful arrest. It emphasized that the warrant was discovered after Shaw had been unconstitutionally detained.

However, on the State's motion for reconsideration, the court reversed itself. Applying the attenuation doctrine set forth in *Brown v. Illinois*, 422 *U.S.* 590, 604–05, 95 *S.Ct.* 2254, 2262, 45 *L.Ed.*2d 416, 428 (1975), the court held that the parole warrant dissipated the taint from the illegal detention because the warrant stood as an independent basis for arresting and searching Shaw.[4] The court referred to other jurisdictions where, despite an initial

---

[4] *Brown, supra,* set forth three factors to be considered in determining whether inculpatory statements elicited by police were sufficiently attenuated from an unlawful stop: (1) "the temporal proximity" between the illegal conduct and the challenged statements; (2) "the presence of intervening circumstances"; and (3)

unlawful stop, "a pre-existing warrant for [a] defendant's arrest" was "deemed to be an intervening, untainted[ ] justification for the arrest and search." The court acknowledged that the police "were on a mission to locate people who have warrants," "went to a high crime area," and then detained a person who "looked suspicious" and whose identity could not be ascertained. Nevertheless, it did not withdraw its previous finding that the police lacked a reasonable and articulable suspicion to make the initial stop. Instead, the court reasoned, based on *Brown,* that the attenuation doctrine saved the search: Shaw was held for only five to seven minutes; he was not searched until after the discovery of the warrant; and he was not the victim of "blatant, egregious police misconduct." The court also posited that Shaw, as a parolee with an outstanding warrant, had "very little expectation of privacy." For these reasons, the court decided against suppressing the evidence.

## C.

After the suppression hearing, Shaw pled guilty to two of the charges in the indictment pursuant to an agreement with the State. Ultimately, the court sentenced Shaw to concurrent eight-year terms with four years of parole ineligibility on the charges of second-degree possession of heroin with intent to distribute and third-degree possession of heroin with intent to distribute in a school zone.[5] The remainder of the indictment was dismissed in accordance with the plea agreement.

Shaw then appealed the trial court's denial of his motion to suppress as permitted by *Rule* 3:5–7(d).

## D.

In an unpublished opinion, the Appellate Division reversed the denial of Shaw's motion to suppress. First, the appellate panel

---

"particularly, the purpose and flagrancy of the official misconduct." 422 *U.S.* at 602–04, 95 *S.Ct.* at 2261–62, 45 *L.Ed.*2d at 427.

[5] The court imposed an extended term on the third-degree school-zone offense.

determined that Shaw was detained as the result of an unconstitu-
tional investigatory detention. According to the panel, at the time
the police stopped Shaw, they had no reason to believe he was the
person named in the arrest warrant; they did not have a reason-
able suspicion he was engaged in criminal activity; and Shaw's
refusal to identify himself "did not provide an objective, articulable
and reasonable basis to justify" his detention.

Second, the panel concluded that the law enforcement officials
did not "obtain[ ] the evidence by means that are sufficiently
independent to dissipate the taint of their illegal conduct," (quot-
ing *State v. Johnson*, 118 *N.J.* 639, 653, 573 *A.*2d 909 (1990) (citing
*Brown, supra*, 422 *U.S.* at 603, 95 *S.Ct.* at 2261, 45 *L.Ed.*2d at
427)). The panel came to that conclusion applying the *Brown*
three-part test.

The panel found that the "five to seven minutes[ ] elaps[ing]"
between the illegal stop and the intervening event"—the discovery
of the parole warrant—favored Shaw. Next, the panel acknowl-
edged that courts in other jurisdictions have held that "an out-
standing parole warrant is an intervening act that can attenuate
the taint of an illegal stop." (Internal quotation marks omitted).
Because the search of Shaw was conducted based on the parole
warrant—the intervening event—and not based on evidence ac-
quired during the illegal detention, the panel maintained that this
most important factor favored the State, (citing *State v. Williams*,
192 *N.J.* 1, 16, 926 *A.*2d 340 (2007)). Last, in assessing "the
purpose and flagrancy of the police misconduct," the panel under-
scored that Detective Brown and his team made "a purposeful
decision not grounded in any particularized suspicion" to detain
Shaw, even though "they did not know him, knew nothing of his
history, and had no reason to believe he had ever been involved in
criminal activity." The panel viewed the stop as a "fishing expedi-
tion." The "flagrancy" factor, the panel stated, favored Shaw.

Significantly, the panel asserted that Shaw did not have a
diminished expectation of privacy as a parolee in the circum-
stances presented here because the police did not have a reason-

able articulable suspicion to justify the investigatory stop. All in all, the panel concluded that a weighing of the *Brown* factors warranted suppression of the evidence.

We granted the State's petition for certification. *State v. Shaw,* 208 *N.J.* 601, 34 *A.*3d 783 (2011).

## II.

The State argues that the Appellate Division erred in invoking the exclusionary rule in this case. It maintains that the detention of Shaw for no more than five minutes was constitutionally permissible "to briefly question defendant about his identity and to maintain the status quo momentarily before [Shaw] walked away from the building." Alternatively, the State urges this Court to find, in applying the *Brown* test, "that the outstanding parole warrant for [Shaw's] arrest ... was an intervening circumstance that dissipated any taint flowing from the initial encounter." It asks this Court to join those other jurisdictions that have held that " 'the discovery of an outstanding arrest warrant prior to a search incident to arrest constitutes an intervening circumstance,' within the meaning of *Brown,* 'that may—and, in the absence of purposeful or flagrant misconduct, *will*—attenuate the taint of the antecedent unlawful [ ] stop,' " (quoting *People v. Brendlin,* 45 *Cal.*4th 262, 85 *Cal.Rptr.*3d 496, 195 *P.*3d 1074, 1076 (2008), *cert. denied,* 556 *U.S.* 1192, 129 *S.Ct.* 2008, 173 *L.Ed.*2d 1103 (2009)).

On the other hand, Shaw urges that we affirm the Appellate Division. He insists that the investigatory stop was not based on a reasonable and articulable suspicion of criminal activity. Moreover, he argues that a balancing of the *Brown* factors weighs in favor of suppression of the evidence. Although acknowledging that the outstanding parole warrant may constitute an intervening circumstance, he insists that "the taint of the police misconduct had not been dissipated when the police discovered the evidence during the search incident to arrest." Shaw emphasizes the alleged flagrancy of the police misconduct, asserting that "[t]his is not a case where the police, in good faith, were mistaken in

believing they had a sufficient level of suspicion to justify stopping the suspect, and then later discovered that there happened to be a warrant out for the suspect's arrest." Instead he points out that "the officers carried out the stop in hope that they would discover an outstanding warrant on the individual they observed simply leaving an apartment complex early in the evening."

### III.

### A.

The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution both guarantee "[t]he right of the people to be secure . . . against unreasonable searches and seizures[.]" *U.S. Const.* amend. IV; *N.J. Const.* art. I, ¶ 7. Because warrantless stops and searches are presumptively invalid, the State bears the burden of establishing that any such stop or search is justified by one of the " 'well-delineated exceptions' to the warrant requirement." *State v. Frankel,* 179 *N.J.* 586, 598, 847 *A.*2d 561 (quoting *Mincey v. Arizona,* 437 *U.S.* 385, 390, 98 *S.Ct.* 2408, 2412, 57 *L.Ed.*2d 290, 298–99 (1978)), *cert. denied,* 543 *U.S.* 876, 125 *S.Ct.* 108, 160 *L.Ed.*2d 128 (2004). Indeed, the State must prove "by a preponderance of the evidence the validity of a warrantless search." *State v. Edmonds,* 211 *N.J.* 117, 128, 47 *A.*3d 737 (2012) (citing *State v. Wilson,* 178 *N.J.* 7, 12–13, 833 *A.*2d 1087 (2003)). In this case, the State claims that Detective Brown and his team conducted a proper investigatory stop of Shaw as he walked from the common entrance of the multi-unit apartment building at 507 Tennessee Avenue—the location at which those law enforcement officers were seeking to execute an arrest warrant.

People, generally, are free to go on their way without interference from the government. That is, after all, the essence of the Fourth Amendment—the police may not randomly stop and detain persons without particularized suspicion. *See Terry v. Ohio,* 392 *U.S.* 1, 9, 27, 88 *S.Ct.* 1868, 1873, 1883, 20 *L.Ed.*2d 889,

898–99, 909 (1968). To be sure, law enforcement officers may conduct a field inquiry without treading on constitutional rights. *State v. Pineiro,* 181 *N.J.* 13, 20, 853 *A.*2d 887 (2004). "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen. . . ." *Florida v. Royer,* 460 *U.S.* 491, 497, 103 *S.Ct.* 1319, 1324, 75 *L.Ed.*2d 229, 236 (1983) (citations omitted) (quoted in *State v. Maryland,* 167 *N.J.* 471, 483, 771 *A.*2d 1220 (2001)). But it is also clear that a person "need not answer any question put to him[,] [that] he may decline to listen to the questions at all and may go on his way," and that "his refusal to listen or answer does not, without more, furnish" grounds for his detention. *Id.* at 498, 103 *S.Ct.* at 1324, 75 *L.Ed.*2d at 236.

▇ A minimally intrusive field inquiry is transformed into an investigative stop or detention—a seizure "within the meaning of the Fourth Amendment"—when "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 *U.S.* 544, 554, 100 *S.Ct.* 1870, 1877, 64 *L.Ed.*2d 497, 509 (1980); *Terry, supra,* 392 *U.S.* at 16, 88 *S.Ct.* at 1877, 20 *L.Ed.*2d at 903 ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."); *State v. Rodriguez,* 172 *N.J.* 117, 126, 796 *A.*2d 857 (2002) (noting that investigative stop occurs "when an objectively reasonable person feels that his or her right to move has been restricted") (citing *State v. Davis,* 104 *N.J.* 490, 498, 517 *A.*2d 859 (1986)).

▇ An investigatory police stop, sometimes referred to as a *Terry* stop, is permissible "if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity." *Pineiro, supra,* 181 *N.J.* at 20, 853 *A.*2d 887 (citations omitted). The standard for this form of brief stop or detention is less than the probable cause showing necessary to justify an arrest. *See*

*ibid.; Royer, supra,* 460 *U.S.* at 500, 103 *S.Ct.* at 1325, 75 *L.Ed.*2d
at 238 ("[A]n investigative detention must be temporary and last
no longer than is necessary to effectuate the purpose of the
stop."). However, an officer's hunch or subjective good faith—
even if correct in the end—cannot justify an investigatory stop or
detention. *State v. Arthur,* 149 *N.J.* 1, 8, 691 *A.*2d 808 (1997).

B.

In reviewing a motion to suppress, we defer to the trial
court's findings of fact. *See State v. Elders,* 192 *N.J.* 224, 244, 927
*A.*2d 1250 (2007) ("A trial court's findings should be disturbed only
if they are so clearly mistaken 'that the interests of justice
demand intervention and correction.'" (quoting *State v. Johnson,*
42 *N.J.* 146, 162, 199 *A.*2d 809)). However, we need not defer to a
trial or appellate court's interpretation of the law. *See State v.
Gandhi,* 201 *N.J.* 161, 176, 989 *A.*2d 256 (2010). We review such
legal issues de novo. *Ibid.*

Here, at 8:00 p.m., Shaw and Gardner walked out of the
front entrance of a multi-unit apartment building and headed in
different directions just as Detective Brown and his team arrived
to execute an arrest warrant. At the suppression hearing, Detec-
tive Brown could remember only the most generic description
given in the arrest warrant: a black male. Despite the fact that
the arrest warrant described just one man, the officers detained
two men.

The only descriptive feature Shaw shared with the fugitive
sought by Detective Brown was that he was a black man. The
trial court found that Shaw did not act in any way that "would
have aroused an objective, articulable suspicion that [he] was
engaged in criminal activity." Detective Brown and his fellow
officers were permitted to ask questions of Shaw—to conduct a
field inquiry—but Shaw was under no obligation to respond. Yet,
Detective Brown was clear in his testimony that Shaw's failure to
answer questions—to identify himself—was the basis for Shaw's
detention. Indeed, although Detective Brown had no objective

basis to believe that Shaw was anyone other than a random person walking out of a residential apartment building, he was prepared to transport Shaw to headquarters and fingerprint him, if necessary, to learn his identity.

No one disputes that Shaw was "seized" within the meaning of our federal or state constitutions. He was not free to leave, and he was held against his will by armed law enforcement officers. The only question is whether Detective Brown and his fellow officers had a reasonable and articulable suspicion to justify the detention. We agree with both the trial court and Appellate Division that the officers did not possess the requisite level of suspicion to detain Shaw. We conclude that Shaw was the subject of an impermissible investigatory detention in violation of the Fourth Amendment and Article I, Paragraph 7 of our State Constitution.

We next address the applicability of the exclusionary rule to this case.

## IV.

### A.

Although Shaw was subjected to an unconstitutional investigatory detention for the purpose of determining whether he was the person named in a warrant to be executed at 507 Tennessee Avenue, he was not searched until the police learned he was named in a different warrant—a parole warrant. The detention lasted for as long as five minutes—and perhaps longer. Significantly, State Parole Officer D'Amico, who participated in Operation FALCON, carried with him a list of those wanted on parole warrants. Shaw's name was on the wanted list. D'Amico was tasked with arresting those named in parole warrants whom he encountered while he assisted in fulfilling the primary objectives of Operation FALCON.

The exclusionary rule generally bars the State from introducing into evidence the "fruits" of an unconstitutional search or

seizure. *Wong Sun v. United States*, 371 *U.S.* 471, 485, 83 *S.Ct.* 407, 416, 9 *L.Ed.*2d 441, 454 (1963). However, the rule is not a "but for" test. The issue is not whether "but for" the improper police conduct incriminating evidence would have been procured against Shaw. *See id.* at 487–88, 83 *S.Ct.* at 417, 9 *L.Ed.*2d at 455. Clearly, had Shaw not been stopped, the police would not have discovered he was wanted on a parole warrant, he would not have been arrested, and he would not have been searched. Rather, the issue is whether the heroin found on Shaw was a product of the "exploitation of [the primary] illegality"—the wrongful detention— or of "means sufficiently distinguishable to be purged of the primary taint"—the parole warrant. *Id.* at 488, 83 *S.Ct.* at 417, 9 *L.Ed.*2d at 455 (internal quotation marks and citation omitted).

Before addressing this precise issue, we briefly review the rationale underlying the exclusionary rule.

### B.

"The exclusionary rule 'is a judicially created remedy designed to safeguard' the right of the people to be to be free from 'unreasonable searches and seizures.' " *Williams, supra*, 192 *N.J.* at 14, 926 *A.*2d 340 (quoting *United States v. Calandra*, 414 *U.S.* 338, 348, 94 *S.Ct.* 613, 620, 38 *L.Ed.*2d 561, 571 (1974)). The rule has a two-fold purpose. One " 'is to deter future unlawful police conduct' by denying the prosecution the spoils of constitutional violations." *State v. Badessa*, 185 *N.J.* 303, 310–11, 885 *A.*2d 430 (2005) (quoting *State v. Evers*, 175 *N.J.* 355, 376, 815 *A.*2d 432 (2003)). In that regard, "[t]he rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins v. United States*, 364 *U.S.* 206, 217, 80 *S.Ct.* 1437, 1444, 4 *L.Ed.*2d 1669, 1677 (1960) (citing *Eleuteri v. Richman*, 26 *N.J.* 506, 513, 141 *A.*2d 46 (1958)). The second purpose "is to uphold judicial integrity by serving notice that our courts will not provide a forum for evidence procured by unconstitutional means." *Williams, supra*, 192 *N.J.*

at 14, 926 *A*.2d 340. Simply put, the exclusionary rule removes the profit motive for those officials who would violate the Constitution.

Although the exclusionary rule "may vindicate the Fourth Amendment rights of a particular defendant, and more generally the privacy rights of all persons," it also may "depriv[e] the jury or judge of reliable evidence that may point the way to the truth." *Id.* at 14–15, 926 *A*.2d 340 (citations omitted). Because of the high price exacted by suppressing evidence, "the exclusionary rule is applied to those circumstances where its remedial objectives can best be achieved." *Id.* at 15, 926 *A*.2d 340 (citing *Calandra, supra,* 414 *U.S.* at 348, 94 *S.Ct.* at 620, 38 *L.Ed.*2d at 571). Thus, when law enforcement officials secure evidence that is sufficiently independent of the illegal conduct—evidence that is not tainted by the misdeed—then withholding evidence from the trier of fact is a cost that may not be justified by the exclusionary rule. *Badessa, supra,* 185 *N.J.* at 311, 885 *A*.2d 430.

## C.

 As explained earlier, the issue is whether the drugs found on Shaw were the product of the "exploitation" of the unlawful stop and detention or of a " 'means sufficiently distinguishable' " from the constitutional violation such that the "taint" of the violation was "purged." *See Hudson v. Michigan,* 547 *U.S.* 586, 592, 126 *S.Ct.* 2159, 2164, 165 *L.Ed.*2d 56, 65 (2006) (quoting *Wong Sun, supra,* 371 *U.S.* at 488, 83 *S.Ct.* at 417, 9 *L.Ed.*2d at 455). "[T]he exclusionary rule will not apply when the connection between the unconstitutional police action and the secured evidence becomes 'so attenuated as to dissipate the taint' from the unlawful conduct." *Badessa, supra,* 185 *N.J.* at 311, 885 *A*.2d 430 (quoting *Murray v. United States,* 487 *U.S.* 533, 536–37, 108 *S.Ct.* 2529, 2533, 101 *L.Ed.*2d 472, 480 (1988)).

The United States Supreme Court limned the contours of the attenuation doctrine in *Brown, supra,* 422 *U.S.* at 602–04, 95 *S.Ct.* at 2261–62, 45 *L.Ed.*2d at 426–27. In that case, the police arrested

the defendant in his apartment at gunpoint for the purpose of questioning him in a murder investigation. *Id.* at 592, 95 *S.Ct.* at 2256, 45 *L.Ed.*2d at 420. The police did not have probable cause to make the arrest. *Ibid.* The defendant was taken to a police station, where he was interrogated after being read his *Miranda* rights.[6] *Id.* at 593–94, 95 *S.Ct.* at 2257, 45 *L.Ed.*2d at 421. Less than two hours after illegally arresting the defendant, the police elicited from him one incriminating statement, and later another incriminating statement. *Id.* at 594–96, 95 *S.Ct.* at 2257–58, 45 *L.Ed.*2d at 421–22. To determine whether the defendant's Mirandized statements were sufficiently attenuated from the illegal arrest to allow their admission into evidence, the Supreme Court looked to three factors: (1) "the temporal proximity" between the illegal conduct and the challenged evidence; (2) "the presence of intervening circumstances"; and (3) "particularly, the purpose and flagrancy of the official misconduct." *Id.* at 602–04, 95 *S.Ct.* at 2261–62, 45 *L.Ed.*2d at 427; *accord Johnson, supra,* 118 *N.J.* at 653, 573 *A.*2d 909. Among other things, the Court found that "[t]he detectives embarked upon this expedition for evidence in the hope that something might turn up." *Brown, supra,* 422 *U.S.* at 605, 95 *S.Ct.* at 2262, 45 *L.Ed.*2d at 428. Ultimately, the Court concluded that the *Miranda* warnings did not purge the taint of the illegal arrest and suppressed the incriminating statements. *Id.* at 605, 95 *S.Ct.* at 2262–63, 45 *L.Ed.*2d at 428.

Whether the discovery of an outstanding parole warrant is sufficient to break the causal chain between an unlawful investigatory detention and a subsequent search is a case of first impression for this Court. However, the application of the attenuation doctrine is a familiar feature of our jurisprudence. For example, we have applied the *Brown* factors in determining the admissibility of a confession that followed an unlawful arrest, *State v. Worlock,* 117 *N.J.* 596, 622–24, 569 *A.*2d 1314 (1990), the admissibility of a police officer's observations after an unconstitutional

---

[6] *Miranda v. Arizona,* 384 *U.S.* 436, 478–79, 86 *S.Ct.* 1602, 1630, 16 *L.Ed.*2d 694, 726 (1966).

motor vehicle stop, *Badessa, supra,* 185 *N.J.* at 305, 885 *A.*2d 430, and the admissibility of evidence seized from a defendant after he resisted police and took flight following an unconstitutional investigatory stop, *Williams, supra,* 192 *N.J.* at 4, 926 *A.*2d 340.

We now turn to the *Brown* framework to decide whether, given the facts of this case, an outstanding parole warrant constitutes an intervening event sufficiently independent to dissipate the taint of an unlawful detention. The answer to that question requires a fact-intensive analysis that encompasses a weighing of all three of the *Brown* factors.

V.

A.

We first consider the temporal proximity between the unconstitutional detention and the discovery of the heroin found on Shaw. Temporal proximity "is the least determinative" of the three factors because whether the passage of time breaks the chain between an unlawful stop and the securing of evidence oftentimes is ambiguous. *Worlock, supra,* 117 *N.J.* at 622–23, 569 *A.*2d 1314. In cases where a confession or consent to search follows shortly after an unlawful stop, the brevity of the interval ordinarily will work against the State. That is because the closeness in time between the two may lend credence to the argument that an unlawful detention was exploited to extract a confession or consent from a suspect. *See id.* at 623, 569 *A.*2d 1314. However, the circumstances here present a different calculus. Shaw cannot credibly argue that he would have benefitted by a longer rather than shorter detention before he was arrested on a valid parole warrant. Holding a suspect in custody without any particularized suspicion for an hour for purposes of a warrant check is certainly a greater constitutional deprivation than holding him for five minutes. Equally clear is that no one in the course of his or her travels would want to be detained by the police for even five minutes in the absence of an objectively reasonable basis. All

in all, we conclude that the temporal proximity factor is at best neutral and does not count against the State.

## B.

The second factor is the presence of intervening circumstances—in this case, the parole warrant for Shaw's arrest. Whether a parole or an arrest warrant is a determinative intervening event in an attenuation analysis necessarily depends on the particular facts of a case. A number of jurisdictions have found that an arrest warrant is an intervening circumstance that purges the taint emanating from an unlawful stop. Notably, in those cases, the unlawful stops were not initiated for the purpose of determining whether the suspects were fugitives; rather, the discovery of the warrants were incidental to unlawful motor vehicle or investigatory stops. *See, e.g., United States v. Johnson,* 383 *F.*3d 538, 546 (7th Cir.2004) (finding that evidence seized after unlawful motor vehicle stop was admissible because of intervening circumstance—outstanding arrest warrant for defendant); *Brendlin, supra,* 85 *Cal.Rptr.*3d 496, 195 *P.*3d at 1080 (holding that despite unlawfulness of traffic stop for expired registration, search of defendant's person and vehicle was constitutional because search occurred only after discovery of outstanding arrest warrant, and therefore drugs were lawfully found); *State v. Hill,* 725 *So.*2d 1282, 1283, 1287 (La.1998) (holding that discovery of arrest warrant was intervening circumstance after unlawful *Terry* stop based on generalized narcotics tip); *McBath v. State,* 108 *P.*3d 241, 242, 248 (Alaska App.2005) (holding that "regardless of the potential illegality of the investigative stop" of truck for expired plates, "the pre-existing arrest warrant was an independent, untainted ground for [passenger's] arrest[,]" and thus drugs discovered were lawfully obtained).[7]

---

[7] Based on its facts, *United States v. Green,* 111 *F.*3d 515, 517–18 (7th Cir.), *cert. denied,* 522 *U.S.* 973, 118 *S.Ct.* 427, 139 *L.Ed.*2d 328 (1997), is somewhat of an outlier from the cases above. That is because the vehicle stop at issue was related to the potential execution of a warrant. *Id.* at 517–18. In *Green,* the

Significantly, two of the courts cited above suggested that the random stopping of people in the hope of picking up some on outstanding warrants is the type of flagrant or purposeful conduct that would weigh against a warrant serving as a determinative intervening circumstance. *See Brendlin, supra,* 85 *Cal.Rptr.*3d 496, 195 *P.*3d at 1082; *McBath, supra,* 108 *P.*3d at 249. In *Brendlin, supra,* the California Supreme Court indicated that where a seizure is "undertaken as a fishing expedition, the third *Brown* factor will make it unlikely that the [State] would be able to demonstrate an attenuation of the taint of the initial unlawful seizure." 85 *Cal.Rptr.*3d 496, 195 *P.*3d at 1082. The *Brendlin* court contrasted the "fishing expedition" scenario with "a chance discovery of an outstanding arrest warrant in the course of a seizure that is later determined to be invalid." *Ibid.* (internal quotation marks and citations omitted).

Similarly, the Alaska appellate court in *McBath, supra,* observed that an arrest warrant may not constitute a determinative intervening circumstance "where the police conducted an unjustifiable 'dragnet' investigative stop of many people, hoping to find some for whom there were outstanding arrest warrants." 108 *P.*3d at 249. In such a case, "the flagrance of the police misconduct may still require suppression of the evidence." *Ibid.*

There is a difference between an unlawful motor vehicle or investigatory stop in which, incidental to the stop, the police learn about an outstanding warrant and, as here, an unlawful stop executed for the specific purpose of ascertaining whether a sus-

---

police unlawfully stopped a car to determine if a known fugitive was inside or whether the occupants might know his whereabouts. *Ibid.* The circuit court found that the subsequent discovery of an outstanding warrant for one of the occupants and that occupant's arrest were intervening circumstances which—"because they are not outweighed by flagrant official misconduct"—attenuated the taint of the unlawful stop. *Id.* at 521. Importantly, with the evident intent of restricting the scope of its decision, the court went on to note that "[i]t is only in the unusual case where the police, after a questionable stop, discover that an occupant is wanted on an arrest warrant that the intervening circumstances exception will apply." *Id.* at 523.

pect is the subject of an arrest warrant. That is a point clearly made in *People v. Mitchell,* 355 *Ill.App.*3d 1030, 291 *Ill.Dec.* 786, 824 *N.E.*2d 642 (2005) (cited with approval in *Brendlin, supra,* 85 *Cal.Rptr.*3d 496, 195 *P.*3d at 1082).

In *Mitchell,* two police officers conducted an unlawful investigatory stop of the defendant, demanding that he provide identification. *Id.* 291 *Ill.Dec.* 786, 824 *N.E.*2d at 644. Using the defendant's identification, one of the officers ran a computer check "to see if there were any warrants outstanding for" him. *Ibid.* The check revealed a traffic warrant that led to the defendant's arrest and to a search that uncovered a small amount of cocaine. *Id.* 291 *Ill.Dec.* 786, 824 *N.E.*2d at 644–45. Applying the *Brown* attenuation doctrine, the Illinois appellate court suppressed the drugs as the product of a search in violation of the Fourth Amendment. *Id.* 291 *Ill.Dec.* 786, 824 *N.E.*2d at 648–50. The *Mitchell* court determined that "the officers stopped defendant for no apparent reason other than to run a warrant check on him. Thus, the purpose of the stop in this case was directly related to the arrest of defendant, which then led directly to the search of defendant." *Id.* 291 *Ill.Dec.* 786, 824 *N.E.*2d at 649. The court concluded that factors two and three in *Brown* weighed in favor of suppression because "the evidence was obtained by exploiting the original illegality." *Id.* 291 *Ill.Dec.* 786, 824 *N.E.*2d at 650. The court noted that suppressing evidence "appears to be the only way to deter the police from randomly stopping citizens for the purpose of running warrant checks." *Ibid.*

As *Mitchell* demonstrated, and as suggested in *Brendlin* and *McBath,* the intervening circumstances and flagrancy factors can become intertwined. That is true in the present case.

The police initiated the stop and detention to determine if Shaw was wanted on a particular arrest warrant. That Shaw was eventually arrested on a different warrant is not of significant import when one considers that Shaw's name was on a parole warrant list carried by Parole Officer D'Amico when he went on patrol during Operation FALCON. D'Amico was prepared to

arrest Shaw and any other wanted parole violator on sight as he assisted in executing other arrests during Operation FALCON. Moreover, these arrests were added to the statistics of Operation FALCON's overall success. While the discovery of the parole warrant preceded the search of Shaw, this can hardly be said to be the "chance discovery of an outstanding arrest warrant" contemplated in *Brendlin, supra,* 85 *Cal.Rptr.*3d 496, 195 *P.*3d at 1082.

Accordingly, the second factor in *Brown* does not weigh in favor of the State here.

## C.

We next turn to "purpose and flagrancy of the official misconduct"—the third *Brown* factor. 422 *U.S.* at 604, 95 *S.Ct.* at 2262, 45 *L.Ed.*2d at 427.

The only discernible features that Shaw—and presumably Gardner—shared with the person sought on the warrant to be executed at 507 Tennessee Avenue were that both were black men. The Appellate Division characterized the stop of these two individuals as a "fishing expedition." Apparently, any other black man walking out of the apartment building at the moment Detective Brown and company arrived would have been detained if he would have refused to identify himself. In that regard, it may have been happenstance that Shaw and Gardner, and not two other individuals, were detained. It also bears mentioning that Detective Brown was prepared, if necessary, to transport Shaw to headquarters for fingerprinting to determine his identification.

The trial court noted that the stop was in a high-crime area. That 507 Tennessee Avenue is located in a high-crime area does not mean that residents in that area have lesser constitutional protection from random stops. *See State v. Valentine,* 134 *N.J.* 536, 547, 636 *A.*2d 505 (1994) (citing *Maryland v. Buie,* 494 *U.S.* 325, 334–35 n. 2, 110 *S.Ct.* 1093, 1098 n. 2, 108 *L.Ed.*2d 276, 286 n. 2 (1990)) (noting that "a stop in a high-crime area does not by itself justify a *Terry* frisk"). Moreover, we disagree with the unrealistically high bar that the trial court set for flagrant con-

duct. The trial court noted that this is "not a case where ...
police tackled [defendant], threw him on the ground, ran his
pockets, found drugs and then asked questions about who he was."
As we have said on another occasion, "[t]he rights of the public to
be free from the unwarranted use of power by law-enforcement
officials would be in a sorry state if evidence obtained in violation
of a citizen's constitutional rights were admissible merely because
the citizen had not been subjected to physical abuse." *State v.
Chippero,* 164 *N.J.* 342, 358, 753 *A.*2d 701 (2000) (quoting *Johnson,
supra,* 118 *N.J.* at 659–60, 573 *A.*2d 909). The right of freedom of
movement without unreasonable interference by government offi-
cials is not a matter for debate at this point in our constitutional
development.

The random detention of an individual for the purpose of
running a warrant check—or determining whether the person is
wanted on a particular warrant—cannot be squared with values
that inhere in the Fourth Amendment and Article I, Paragraph 7
of our State Constitution. A random stop based on nothing more
than a non-particularized racial description of the person sought is
especially subject to abuse.

We have previously said that the third *Brown* "factor requires
consideration of the manner in which the defendant was ...
detained." *Chippero, supra,* 164 *N.J.* at 357, 753 *A.*2d 701. Here,
this factor weighs most heavily against the State and is determina-
tive in our analysis.

## VI.

In balancing all three of the *Brown* factors, we conclude that, in
the specific circumstances of this case, the parole warrant was not
an intervening circumstance that sufficiently purged the taint from
or attenuated the effect of the unlawful detention. Shaw was
detained to determine if he was named in an arrest warrant and
ultimately arrested because he was the subject of a warrant—
albeit a different one than the warrant that triggered the stop.
We do not suggest that the discovery of an arrest warrant in other

scenarios—as incident to an unrelated unlawful motor vehicle or investigatory stop—would not constitute a determinative intervening circumstance. *See, e.g., Brendlin, supra,* 85 *Cal.Rptr.*3d 496, 195 *P.*3d at 1080–82; *McBath, supra,* 108 *P.*3d at 249–50.

In *State v. Williams, supra,* we noted that had the "defendant merely stood his ground and resorted to the court for his constitutional remedy, then the unlawful stop would have led to the suppression of the [evidence]." 192 *N.J.* at 17, 926 *A.*2d 340. Shaw did not resist or take flight. He has sought his remedy in this Court and is entitled to relief.

The application of the exclusionary rule in this case is not only about Don Shaw but also about the right of all individuals to be free from random stops. "Suppressing evidence sends the strongest possible message that constitutional misconduct will not be tolerated and therefore is intended to encourage fidelity to the law." *Id.* at 14, 926 *A.*2d 340. Our jurisprudence commands that suppression is the appropriate remedy in this case.[8]

## VII.

Accordingly, we affirm the judgment of the Appellate Division reversing the trial court and granting Shaw's motion to suppress the evidence seized from him after his arrest on the parole warrant. To be clear, this determination does not provide Shaw relief for any preexisting violation of his parole or any charges arising from the warrant issued by the Galloway Township Municipal Court. We remand to the trial court for proceedings consistent with this opinion.

*For affirmance and remandment*—Chief Justice RABNER, Justices LaVECCHIA, ALBIN, HOENS and PATTERSON—5.

*Opposed*—None.

---

[8] Although we conclude that the Fourth Amendment of the United States Constitution compels the result in this case, Article I, Paragraph 7 of our State Constitution provides an independent ground for our decision.