**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5651-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DARIUS A. WILLIAMS,

     Defendant-Appellant.

_____

Submitted October 27, 2020 – Decided December 17, 2020

Before Judges Fisher and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 17-05-1303.

Joseph E. Krakora, Public Defender, attorney for appellant (Patrick D. Laconi, Designated Counsel on the brief).

Jill S. Mayer, Acting Camden County Prosecutor, attorney for respondent (Rachel M. Lamb, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Darius A. Williams appeals from his conviction following a conditional retraxit plea of guilty to third-degree possession of a rifle, N.J.S.A. 2C:39-5(c)(1).[1]  On appeal, he argues the motion judge erred in denying his motion to suppress marijuana, crack cocaine and cash found on his person following his arrest, a handgun found under a vehicle near the location at which he was arrested and marijuana, a rifle and ammunition seized from that vehicle. Specifically, he contends:

> POINT I
>
> THE PRE-TRIAL COURT SHOULD HAVE SUPPRESSED THE EVIDENCE OF MARIJUANA RECOVERED FROM WILLIAMS' PERSON, AND THE HANDGUN RECOVERED DURING THE SEARCH INCIDENT TO WILLIAMS' ARREST BECAUSE THE POLICE SEIZED WILLIAMS[] WITHOUT A REASONABLE ARTICULABLE SUSPICION THAT WILLIAMS WAS ENGAGED IN, OR ABOUT TO ENGAGE IN, CRIMINAL ACTIVITY, RENDERING THE RECOVERY OF MARIJUANA AND THE HANDGUN FRUIT OF THE POISONOUS TREE.
>
> A.    THE POLICE SEIZED [DEFENDANT].

---

[1] Per the terms of the plea agreement, defendant's other indicted charges were dismissed:  third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1) (count one); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1) (count two); and third-degree resisting arrest, N.J.S.A. 2C:29-2(a)(3)(a) (count four).

A-5651-17T4

B.    THE POLICE SEIZED [DEFENDANT] WITHOUT REASONABLE SUSPICION THAT CRIMINAL ACTIVITY WAS AFOOT; THEREFORE THE SEIZURE VIOLATED THE FOURTH AMENDMENT.

C.    THE PRE-TRIAL COURT ERRED IN NOT SUPPRESSING THE EVIDENCE OF ILLEGAL DRUGS AND CASH FOUND IN [DEFENDANT'S] POCKET.

D.    THE PRE-TRIAL COURT INCORRECTLY HELD THAT [DEFENDANT] RESISTED ARREST AND ABANDONED THE HANDGUN.

POINT II

THE MARIJUANA, RIFLE[] AND AMMUNITION SEIZED FROM [DEFENDANT'S] AUTOMOBILE SHOULD HAVE BEEN SUPPRESSED AS A RESULT OF THE UNLAWFUL SEARCH OF [DEFENDANT'S] AUTOMOBILE, IN VIOLATION OF THE AUTOMOBILE EXCEPTION TO THE WARRANT REQUIREMENT.

We agree with defendant that the motion judge erred in finding the police conducted a proper investigatory stop of defendant, justifying the subsequent actions that led to defendant's arrest and the seizure of evidence from his person. But we agree with the motion judge's conclusion, if not all of his reasoning, that the handgun under the vehicle and the evidence found in the vehicle were

3

properly seized. As such, we affirm in part, reverse in part and remand for further proceedings.

The motion judge rendered an oral decision immediately after an evidentiary hearing at which he heard testimony from two police officers and a woman who was sitting in the passenger seat of the vehicle that was searched. We defer to the judge's factual findings—especially those that "are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy," State v. Johnson, 42 N.J. 146, 161 (1964)—so long as those findings are "supported by sufficient credible evidence in the record," State v. Elders, 192 N.J. 224 (2007).

The motion judge concluded police officers Basil Dicerbo and Bernard Tighe were justified in performing an investigatory stop of defendant and Tyrone Wilson based on Dicerbo's testimony that for approximately two hours the officers observed defendant and Wilson "move away or . . . secrete themselves" each time the officers' patrol car approached their location in the 1300 block of Chase Street, "a high-crime area in a location where a known . . . drug set . . . operate[d]." Shortly thereafter the officers parked their patrol car on a different block and walked toward the men. The judge determined "there certainly was basis for suspicion" based on those facts.

4

The judge continued: "To the extent that there was not reasonable[,] articulable suspicion that a crime was being committed" at that point, the added fact that as the officers turned onto Chase Street, "someone in a car at the corner yell[ed], '[y]urp,' . . . a common term to warn drug dealers that police are approaching," coupled with the other circumstances known to the officers, "at that point [provided] reasonable[,] articulable suspicion that criminal activity was afoot[.]"

The judge found "any potential suspicion" was "increased" when defendant bladed his body when Dicerbo approached him, providing a "basis to at least perform a Terry[2] stop . . . and detain [defendant and] do at least a protective search for weapons." The motion judge found:

> It was appropriate at that point in order to protect himself to ask [defendant], particularly where he saw a bulge—he asked him to remove his hands from his pocket—after he had him sit on—sit down, he asked him to remove his hands from his pocket. [Defendant] then put his hands back in. The officer observed a bulge in the pocket. It was appropriate to ask what's in the pocket in order to protect officer safety.
>
> Once [defendant] responded—first off, at that point, the officer has—he's permitted to make a search at that point for weapons, which would have included a search of that pocket, but, once [defendant] indicates that he has marijuana—and I do find the officer credible, even

---

[2] Terry v. Ohio, 392 U.S. 1 (1968).

though the defense argues in its brief that the officer's testimony or statement to that effect is not credible, I do find the officer himself, based on observing him, his demeanor, his cooperativeness as he testified, to be credible—so that creates probable cause when that acknowledgement is made. Therefore, I find it—the drugs found on [defendant] are admissible.

There is no question that defendant was seized. Dicerbo said as he approached defendant on the sidewalk, defendant "bladed his body and turned around to walk up the steps of a porch" five to ten feet from the vehicle. Dicerbo testified defendant's blading was indicative of "carrying either a firearm or narcotics." Based on his training and experience, he believed defendant "was armed and dangerous." He "grabbed [defendant] and told him to take a seat," explaining if he did not "pat him down right then and there for weapons, [defendant] would have walked right inside the house[,] and [he] had to take control of the situation and tell him to sit down." Defendant complied.

An investigatory stop, familiarly known as a Terry stop, occurs when police detain a person who would not reasonably feel free to leave, even though the encounter falls short of a formal arrest. State v. Stovall, 170 N.J. 346, 355-56 (2002); see also Terry, 392 U.S. at 20-22. Dicerbo's conduct left no doubt that defendant did not reasonably believe he could walk away from the officer.

Under Terry, however, a police officer can detain an individual for a brief period if the stop "is based on 'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." State v. Rodriguez, 172 N.J. 117, 126 (2002) (quoting Terry, 392 U.S. at 21). Under this standard, "[a]n investigatory stop is valid only if the officer has a 'particularized suspicion' based upon an objective observation that the person stopped has been [engaged] or is about to engage in criminal wrongdoing." State v. Davis, 104 N.J. 490, 504 (1986).

Reviewing the judge's conclusions of law de novo, State v. Gamble, 218 N.J. 412, 425 (2014), reversal is required because the motion judge's findings are so clearly mistaken "that the interests of justice demand intervention and correction," Johnson, 42 N.J. at 162; see also Elders, 192 N.J. at 244.

Accepting the motion judge's finding that Dicerbo's testimony was credible, the circumstances known to Dicerbo when he effected the stop were that he observed defendant and Wilson during an approximate two-hour span standing in a high-crime area in a location where a known drug set operated. When asked on cross-examination how he distinguished "between the guys who are the criminals and the people who are just standing out hanging around," Dicerbo said his suspicion is raised "when people see [his] marked patrol vehicle

[and] immediately walk away to the opposite direction," prompting his investigation. The officer said he wanted to "investigate the criminal nature that [he] believed . . . was going on." When asked on cross-examination what "specifically . . . [he] thought these people were doing," Dicerbo replied, "I don't know; I was investigating it. . . . I believe—it's a known drug set, so I believed that they were selling drugs." When asked what caused him to believe the two were selling drugs, he continued: "Because it's a known drug set and that's what happens. [T]hey walk away when they see police because . . . they don't want— they're not comfortable when they see police."

Dicerbo also testified that as the officers were about to turn onto Chase Street, a car "came right to the stop sign" at the intersection, and the occupant yelled, "yurp," and drove off. Dicerbo associated that term with a signal given by a lookout to notify drug dealers of police presence in the area. Dicerbo saw defendant and Wilson as he walked onto Chase Street. Wilson was "looking around." Dicerbo passed him and approached defendant who "bladed his body then turned around" and walked away. Dicerbo did not recall saying anything to defendant, but may have said something approximating, "[h]ey, Buddy, come here," because Dicerbo believed defendant was "armed and dangerous." Dicerbo grabbed defendant as he walked up the stairs and told him to sit down.

8

Considering the officer's observations, see Davis, 104 N.J. at 501, the totality of the circumstances does not establish a reasonable and articulable suspicion that defendant was engaged or was about to be engaged in criminal activity, see id. at 504. In analyzing those circumstances, we view the "whole picture" rather than taking each fact in isolation. Stovall, 170 N.J. at 361; see also State v. Nelson, 237 N.J. 540, 554 (2019). This analysis also considers police officers' "background and training," Nelson, 237 N.J. at 555, including their ability "to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person,'" ibid. (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)).

The formula we utilize is not strict; it is "a sensitive appraisal of the circumstances in each case." Davis, 104 N.J. at 505. The officer's observations are "seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." United States v. Cortez, 449 U.S. 411, 418 (1981); see also Davis, 104 N.J. at 501.

Under these precepts, as Dicerbo admitted, he had nothing more than a belief that defendant was dealing drugs and was armed. His subjective belief was a hunch which does not establish the requisite reasonable, articulable suspicion. See State v. Arthur, 149 N.J. 1, 8 (1997).

Dicerbo admitted he did not observe defendant or Wilson engage in any drug-related activity such as exchanges, or any criminal activity. He observed nothing more than the two men standing near a vehicle and turning and walking away from the police vehicle when it approached.

Even when police approach, citizens have the right to walk away and their "'refusal to listen or answer does not, without more, furnish' grounds for [their] detention." State v. Shaw, 213 N.J. 398, 410 (2012) (quoting Florida v. Royer, 460 U.S. 491, 498 (1983)). It is axiomatic, then, that citizens have the right to walk away without fear of detention when, absent any interaction with police, they simply see a police vehicle. See State v. Williams, 410 N.J. Super. 549, 556 (App. Div. 2009) (questioning whether a defendant who rode a bicycle away from approaching officers fled because police had not ordered him to stop, nevertheless reiterating flight alone cannot justify a Terry stop).

As Dicerbo conceded on cross-examination, people walking away from police as they approach does not inform an officer that they are "up to no good." On direct examination, he said his belief that the pair's act of walking away from the patrol car indicated they were "involved in some type of criminal activity" was based on his training and experience. Dicerbo did not, however, explain what training and experience—less than four years as a police officer, with

10

basic–academy training in narcotics, and fifty to seventy-five narcotics arrests and five to ten firearms arrests—led him to that conclusion. Nor did he explain what training and experience he had with suspects blading their bodies led him to conclude defendant was armed and dangerous. The officers saw nothing during their two-hour observation that equated with weapons possession or narcotics.

Defendant did not relinquish his constitutional rights by his presence in a high-crime area. See Shaw, 213 N.J. at 420. And the person yelling, "yurp," did little to add to the totality of the circumstances. It was a known location for narcotics distribution. People standing in those areas retain their right against random stops just as those in high-crime areas—usually, they are one and the same. Moreover, nothing linked the voiced warning to defendant. As we have already detailed, defendant did not flee when the person yelled the warning. Though Wilson "look[ed] around," defendant remained in the same location and did not attempt to go up the stairs until Dicerbo was close by.

We emphasize that defendant's actions, taken as a whole, did not present both innocuous and criminal activity, open to interpretation. See State v. Citarella, 154 N.J. 272, 279-80 (1998) ("The fact that purely innocent connotations can be ascribed to a person's actions does not mean that an officer

cannot base a finding of reasonable suspicion on those actions as long as 'a reasonable person would find the actions are consistent with guilt.'") (quoting Arthur, 149 N.J. at 11).

The one record fact that would have justified the stop was not observed until after defendant was detained. Only when defendant was seated on the steps did Dicerbo notice the bulge in defendant's pockets after he complied with Dicerbo's order to take his hands out of his pockets. That observation, and defendant's ensuing admission that he possessed marijuana on his person, leading to his arrest and the discovery of marijuana, crack cocaine and cash, stemmed from the unlawful detention. Accordingly, those items must be suppressed. See Shaw, 213 N.J. at 421-22.

The seizure of the gun found under the vehicle proximate to where defendant was arrested, however, requires a discrete analysis. The motion judge found Tighe heard a metallic object hit the ground as he and Dicerbo attempted to handcuff defendant who was resisting arrest. The judge denied suppression because

> the gun under the car is not only in plain view, . . . at that point, not only is it abandoned property, but in order to properly protect the community it would be unreasonable to ask officers to leave a handgun that they observe in a public area for children or others.

His recitation of those warrant and standing exceptions—without analysis of their components—ignored hornbook law that our Supreme Court quoted with approval in State v. Tucker, 136 N.J. 158, 172 (1994) (quoting 1 Wayne R. LaFave, Search and Seizure § 2.6(b), at 471-72 (2d ed. 1987)):

> "Property is not considered abandoned when a person throws away incriminating articles due to the unlawful actions of police officers."  Thus, where a person has disposed of property in response to a police effort to make an illegal arrest or illegal search, courts have not hesitated to hold that property inadmissible.

The Court recognized Professor LaFave's admonition that to admit evidence that was discarded during an illegal seizure would encourage constitutional violations because "attempts to dispose of incriminating evidence [are] common and predictable consequences" of police misconduct.  Ibid. (quoting 4 LaFave, § 11.4(j), at 459-60).[3]  The Court held Tucker's discard of the cocaine packets as he ran from the police "transpired after he no longer was free to leave and after the police had unlawfully seized him"; thus the evidence should have been suppressed.  Id. at 173.

---

[3]  Professor LaFave's principles, cited in Tucker, remain unchanged in the most recent edition of his hornbook.  See 1 Wayne R. LaFave, Search and Seizure § 2.6(b), at 923-24 (6th ed. 2020); 6 id. § 11.4(j), at 500.

Evidence found after an illegal seizure should be excluded if it "was a product of the 'exploitation of [the primary] illegality'—the wrongful detention—[rather than a product] of 'means sufficiently distinguishable to be purged of the primary taint.'" Shaw, 213 N.J. at 413 (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)). The determination whether significant attenuation exists to dissipate the taint of an illegal seizure does not focus on whether "but for" the police misconduct, the evidence would not have been seized. Ibid. Instead, it analyzes three factors announced in Brown v. Illinois, 422 U.S. 590, 603-04 (1975), and adopted by our Supreme Court: "(1) the temporal proximity between the illegal conduct and the challenged evidence; (2) the presence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct." State v. Johnson, 118 N.J. 639, 653 (1990).

In perpending these factors, we have suppressed evidence where it was discarded during flight after an illegal seizure. We excluded cocaine discarded by a defendant as police, who ran after him, unlawfully grabbed him as he pedaled away. Williams, 410 N.J. Super. at 553, 564. We suppressed a dollar bill containing cocaine residue that a driver threw over a guardrail while resisting an unlawful pat down search. State v. Casimono, 250 N.J. Super. 173, 186-88 (App. Div. 1991). And in Shaw, the Court suppressed two bricks of

heroin possessed by a defendant who was unlawfully stopped for an arrest warrant check, and later arrested on a parole warrant; the Court ruled the parole warrant was not an intervening circumstance that purged the taint of the unlawful detention. 213 N.J. at 421-22.

In those cases, however, defendants did not resist arrest. Dicerbo's testimony, deemed credible by the motion judge, established that after defendant responded that the bulge in his pocket was "weed," Dicerbo had defendant stand and grabbed his right arm. Defendant resisted by pulling his arm "closer to his body as if he [were] reaching for something towards his . . . stomach area." Defendant attempted to flee and both officers "took him to the ground." As he went to the ground, Tighe "heard the distinctive sound of metal hit the ground" as defendant reached out his hands toward the nearby vehicle under which the gun was found after defendant was handcuffed.

Obviously, the alleged discard of the gun by defendant took place very shortly after defendant was seized. The temporal proximity factor, though, "'is the least determinative' of the three factors." Id. at 416 (quoting State v. Worlock, 117 N.J. 596, 623 (1990)). Nevertheless, the brief time lapse suggests defendant's alleged discard was related to the seizure.

A-5651-17T4

Turning to the third factor, which "requires consideration of the manner in which the defendant was . . . detained," State v. Chippero, 164 N.J. 342, 357 (2000), we recognize police need not resort to physical abuse before their conduct can be considered flagrant, and "[t]he right of freedom of movement without unreasonable interference by government officials is not a matter for debate at this point in our constitutional development," Shaw, 213 N.J. at 420-21. Dicerbo and Tighe stopped defendant because of their mistaken belief Wilson's and defendant's conduct established a reasonable and articulable suspicion they were selling drugs and defendant was armed. We cannot countenance such police behavior. But we note the officers did not stop defendant because of his race or some other nefarious reason or subject defendant to any unprofessional behavior. The officers did not resort to any physical contact, other than grabbing defendant as he attempted to go up the steps, until he resisted arrest.

A defendant's post-seizure conduct can constitute an intervening act that breaks the nexus to the unlawful stop under the second factor. In State v. Williams, 192 N.J. 1, 5, 15-18 (2007), the Court deemed defendant's acts of pushing one of the detaining officers and fleeing sufficient to attenuate the taint from the unlawful stop and attempted pat-down to warrant admission of a

handgun found on the defendant after police caught him. Although we held the dollar bill discarded by the defendant in <u>Casimono</u> should have been suppressed, we determined a paper bag containing cocaine was admissible because that defendant disregarded the officer's command to remain outside the car, returned to his car, retrieved the bag and threw it over the guardrail. 250 N.J. Super. at 186-87. We determined that defendant's actions caused "a significant break in the chain of causation between the illegal [pat down] searches and the discovery of the cocaine." <u>Id.</u> at 187. And in <u>State v. Seymour</u>, 289 N.J. Super. 80, 83-85 (App. Div. 1996), we held the taint from an unlawful motor vehicle stop was purged when the defendant disregarded the police signal to stop leading to a mile-and-one-quarter eluding during which defendant increased his speed, swerved into the shoulder and threw cocaine from the car.

Defendant allegedly discarded the gun found under the car, not during the initial seizure, but during his resistance against the police officers. The Court cogently differentiated between circumstances where a defendant does not take any action after an unlawful police action and those where a defendant commits a subsequent offense, contrasting the defendants in their decisions in <u>Williams</u> and <u>Shaw</u>:

> In <u>State v. Williams</u>, . . . we noted that had the "defendant merely stood his ground and resorted to the

court for his constitutional remedy, then the unlawful stop would have led to the suppression of the [evidence]." 192 N.J. at 17[]. Shaw did not resist or take flight. He has sought his remedy in this Court and is entitled to relief.

[Shaw, 213 N.J. at 422.]

Similarly, had police discovered the gun on defendant's person during the unlawful stop, the gun would have been suppressed. But the balance of the three Brown factors leads us to conclude the gun found under the car should not be excluded. Defendant's intervening resistance is a significant factor in our determination that the taint from the officers' unlawful stop was sufficiently attenuated. See Worlock, 117 N.J. at 623 (recognizing that intervening events "can be the most important factor in determining whether [evidence] is tainted").

An analysis of those same three factors compels our conclusion that the evidence found inside the Hyundai is admissible. The motion judge found that Officer Matthew Greer's credible testimony established he "was asked to address for safety reasons an individual sitting in a vehicle" near the location where defendant was arrested. When he looked into the vehicle parked on the public street, he saw a jar containing what, based on his training and experience, he recognized to be marijuana. The judge determined the unplanned plain view discovery established probable cause for the subsequent search of the vehicle

under the automobile exception to the warrant requirement, during which additional marijuana, a rifle and ammunition were discovered.

Greer's testimony supports the judge's findings. He "was just standing by for scene safety to make sure the scene was secure . . . [and] nobody else came onto the scene" after defendant and Wilson were detained. One of the several officers on the scene mentioned that vehicle was associated with defendant or Wilson, or both, prompting Greer to go "over to make sure it was secure." He approached the vehicle, occupied by a female in the front passenger seat, on the driver's side and, standing on the street peering into the vehicle, saw "a jar of marijuana on the floor of the driver's seat." From his training—including that in the packaging of narcotics—and experience—four years as an officer and detective who made possibly hundreds of arrests, half of them involving narcotics—he recognized the tinted jar as common packaging for marijuana.

Greer ordered the female to exit the vehicle, recovered the jar he saw and searched the interior of the car. Other officers found the remaining evidence in the trunk.

Again, Greer's observations were made after defendant resisted arrest following the unlawful stop, but while defendant was still on scene. Greer's actions were attenuated not only by defendant's intervening conduct, but by

19

Greer's purpose in scene security, an action that had no direct correlation to the unlawful stop. We thus reject defendant's argument that the vehicle search was directly related to the unlawful stop. Greer's search did not come about by exploitation of the unlawful stop; it had a discrete genesis. As such the discovery was independent of the unlawful police conduct and suppression was not required. See State v. Curry, 109 N.J. 1, 14-15 (1987).

We also reject defendant's argument that because of Greer's knowledge of the link between defendant and the vehicle, the search of the vehicle ran afoul the automobile exception strictures. The most recent statement of the law governing that exception "[i]n the aftermath of Witt,[4] . . . now authorizes warrantless on-the-scene searches of motor vehicles in situations where: (1) the police have probable cause to believe the vehicle contains evidence of a criminal offense; and (2) the circumstances giving rise to probable cause are unforeseeable and spontaneous." State v. Rodriguez, 459 N.J. Super. 13, 22 (App. Div. 2019). The record does not support defendant's argument.

Dicerbo and Tighe did not approach defendant and Wilson because of anything to do with the vehicle. Moreover, Greer testified on cross-examination he was not told the person sitting in the car was involved in anything improper.

---

4  State v. Witt, 223 N.J. 409 (2015).

Indeed, no officer had gone over to the vehicle even though defendant and Wilson had been secured and other officers were at the scene. Greer's only purpose in approaching the vehicle was "to make sure that there was . . . no risk at that point." He looked into the vehicle "to see . . . who was in there and . . . if there [were] any weapons or anything like that."

He was not looking for anything related to defendant. As he testified, "[i]t wasn't [his] investigation." There is no evidence his sighting of the jar of marijuana was foreseeable and not spontaneous. His unchallenged plain view sighting led to the complete search of the vehicle at the scene by officers who "had the discretion to proceed instead with a warrantless roadside search, because the two critical elements of Witt, i.e., probable cause and spontaneity, were satisfied. In addition, there was no unreasonable delay in the officers making their decision to proceed with the search at the scene." See id. at 15.

We reverse the motion judge's denial of defendant's motion to suppress evidence seized from his person following the unlawful stop, but affirm the denial of the motion to suppress the gun found under the car and the evidence seized from the interior and trunk of the vehicle.

Notwithstanding the State's contention that defendant pleaded guilty to the possession of the rifle found in the vehicle, he did so after the judge denied

his motion. We vacate that plea because there is a possibility defendant would not have pleaded guilty if he knew the evidence seized from his person was suppressed. We realize defendant may still wish to plead guilty despite the partial suppression, but we have no way to discern defendant's assessment of the strengths and weaknesses of the revised evidence. Hence, we remand this matter to the trial court for further proceedings.

Reversed in part, affirmed in part and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5651-17T4