**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2878-16T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KASIB M. FORD, a/k/a
QUASIM WILLIAMS,

    Defendant-Appellant.

_____

        Argued March 12, 2018 — Decided August 20, 2018

        Before Judges Accurso, O'Connor and Vernoia.

        On appeal from Superior Court of New Jersey,
        Law Division, Union County, Indictment Nos.
        16-03-0204 and 16-04-0286.

        Joshua D. Sanders, Assistant Deputy Public
        Defender, argued the cause for appellant
        (Joseph E. Krakora, Public Defender,
        attorney; Joshua D. Sanders, on the brief).

        Sarah E. Elsasser, Deputy Attorney General,
        argued the cause for respondent (Gurbir S.
        Grewal, Attorney General, attorney; Sarah E.
        Elsasser, on the brief).

PER CURIAM

Following the denial of his motion to suppress evidence seized in a warrantless search, defendant Kasib M. Ford pled guilty to unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1), and was sentenced in accordance with a supplemental non-negotiated plea form to a term of nine-and-one-half years in State prison with a forty-two month period of parole ineligibility, concurrent to an aggregate nine-year term on an unrelated indictment. Defendant appeals from the denial of his motion to suppress the handgun found in a bag he was carrying at the time of his arrest. We reverse.

The only witness to appear at the suppression hearing was the arresting officer. He testified he and his partner were dispatched in October 2015 to an address on Jefferson Avenue in Elizabeth on a report of "shots fired." In route, they were advised the suspect, "a black male carrying a bag," was walking toward Kellogg Park. Within a minute or so, they saw defendant, a black male carrying two bags, "come from the direction of the park" and cross North Avenue. Although it was dark, the officer testified he had no trouble seeing defendant because the streetlights provided ample light.

The officer testified his partner immediately stopped their patrol car, and, "[d]ue to the nature of the call," he drew his service weapon as he got out and ordered defendant "to stop and

put his hands up at gunpoint." According to the officer, defendant "dropped both bags, [but] he did not put his hands up." Instead, defendant, who had been walking toward the officers, "just kept walking west on North Avenue" in the direction of the officers. Defendant ignored several more commands to raise his hands and stop. As defendant turned into the street away from the officers, another patrol car arrived, cutting him off. The officer estimated defendant had by then walked twenty to twenty-five feet toward the officers from where he dropped the bags and another fifteen feet after turning into the street. When asked on cross-examination whether defendant could have at any point "disengage[d]" the contact, the officer replied, "my position was to stop him because I believed he was a suspect in a shooting."

According to the officer, after the second patrol car arrived, defendant "went down to his knees." The officers, however, had "order[ed] him to the ground, based again on the nature of the call." When he "refused to cooperate with any further orders," the officers "used force against him to get him to the ground and to get him handcuffed." The officer described the bags defendant had been carrying as a "drawstring-type backpack" and "a plastic shopping bag." Inside one of the bags, the officer found a loaded .45 caliber handgun. A search

3

incident to arrest revealed ammunition for the gun in a front pocket of defendant's pants.

In response to questions from the court about the sequence of events, the officer testified he was "already out of the car" with his "gun drawn" when defendant "dropped the bags." When the court asked whether he had "said anything to Mr. Ford yet," the officer replied "it kind of happened real fast" and he did not "know whether it was as [he] was saying things [defendant] dropped the bags" but agreed it was "about the same time."

When the court returned to the timing a few minutes later in an effort to pinpoint the sequence, the court engaged in the following exchange with the witness:

> Court: So you get out of the car. You have your weapon drawn. You're now telling Mr. Ford, Stop, and Show me your hands.
>
> Officer: Correct.
>
> Court: And, at that point, he drops the bags.
>
> Officer: It was kind of a simultaneous thing. It — it wasn't very prolonged.
>
> Court: You mean the conversation?
>
> Officer: Yes.
>
> Court: So — but, in other words, I'm guess I'm trying to figure out — you're getting out of the car.
>
> Officer: Mm-hmm.

4

Court:  You have your gun drawn.

Officer:  Mm-hmm.

Court:  You're, I guess, right away telling him, Stop, and, Let me see your hands.

Officer:  Correct.

Court:  And pretty much right away does he drop the bags or —

Officer:  Yes.  He dropped the bags right away.

In response to further questions from the court, the officer described the area as a mixed residential and commercial neighborhood, with "a very active park," near a train station, a school and a Stop and Shop.  The officer told the court it was not a high crime area, and he and his partner "were actually surprised that there was this type of call in that area."  He testified if he and his partner "hadn't been dispatched to a call of shots fired and given the suspect description that [they] were given, [they] probably would have continued to drive right past Mr. Ford."

The court first noted the officer was "very credible," "calm, clear, consistent" and his testimony straightforward. The court found no question but that the officer "had his weapon drawn as he got out of the car."  Finding defendant obligated to stop when ordered by the officer, "[w]hether he thought the

officer was right or wrong, [or] whether he liked the fact that a gun was pointed at him," and that he did not stop but instead dropped the bags and walked away, the court found defendant abandoned the bags.

Based on the officer's testimony, the court concluded that what the police "were doing here, [is] they were making a field inquiry." In considering "the totality of the circumstances," the court found:

> that basically the officer, even though he had his gun drawn, and I put on the record that certainly in a report of shots fired the officer has a right to have his gun drawn, basically it was the defendant who turned what really was going to be a field inquiry into an investigative detention and ultimately into probable cause to arrest and certainly to search those bags.

Assessing the reasonableness of the officer's conduct, the court concluded:

> [T]he police officers had every right to approach Mr. Ford. There was a report of shots fired, black male carrying a bag, coming from the general direction of the area where the shots were fired, walking through the park. Again, not a particular description. No, there was no complexion, no hair, facial hair. But generally Mr. Ford fit the description, and the police have a duty to investigate suspicious behavior, and certainly shots fired is suspicious behavior, and they had every right to stop Mr. Ford, certainly to inquire, Where are you coming from? What's

6                                                          A-2878-16T1

your name?  Where are you going?  A field inquiry.

But that field inquiry escalated to an investigative detention not by the police, by Mr. Ford dropping the bags, which I think is suspicious, refusing to obey the officer's commands.  I mean, it developed into a reasonable and articulable suspicion that criminal activity had occurred.

. . . .

So I find that the stop was lawful, even though I do find it was abandoned property for all the reasons I set forth on the record.  Certainly the police had the right to approach Mr. Ford, stop him, ultimately attempt to place him under arrest, which they did.  He did resist.  He was subdued by other police officers. . . . And I find certainly that the search of the bag was lawful.

Defendant appeals, arguing the police "did not possess reasonable suspicion sufficient to stop [defendant] at gunpoint, and the evidence obtained after the unconstitutional seizure was not sufficiently attenuated from the taint of that unconstitutional stop to justify its admission into evidence." The State counters that defendant voluntarily abandoned the bags, making the subsequent search and seizure proper; that the officer had reasonable and articulable suspicion to believe "defendant had engaged or was about to engage in criminal activity and was attempting to flee the area"; and even assuming defendant was illegally stopped, suppression of the evidence was

unwarranted because defendant committed the crime of obstruction by fleeing from the officer.

Our standard of review on a motion to suppress is well established.  State v. Gamble, 218 N.J. 412, 424-25 (2014).  We defer to the trial court's factual findings on the motion, unless they were "clearly mistaken" or "so wide of the mark" that the interests of justice require appellate intervention. State v. Elders, 192 N.J. 224, 245 (2007) (internal quotations omitted).  Our review of the trial court's application of the law to the facts, however, is plenary.  State v. Hubbard, 222 N.J. 249, 263 (2015).

Stated differently, while "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers," the trial court's "determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal."  Ornelas v. United States, 517 U.S. 690, 699 (1996).  Applying that standard here, we note we have no quarrel with the trial court's careful fact finding.  We disagree about what those facts mean for the constitutionality of this stop.

In our view, the key facts established by the court's careful questioning of the officer are that he was "already out

of the car" with his "gun drawn" when defendant "dropped the bags." Accordingly, the issue in this case was never the distinction between a field inquiry and an investigative detention. See State v. Rosario, 229 N.J. 263, 272-73 (2017). Police do not conduct a field inquiry with a citizen at the point of a gun. See State v. Rodriquez, 172 N.J. 117, 126 (2002).

Defendant was seized within the meaning of the Fourth Amendment the moment the officer pointed his gun at defendant and told him to stop and put his hands up.[1] See Kaupp v. Texas, 538 U.S. 626, 629-30 (2003); United States v. Mendenhall, 446 U.S. 544, 554 (1980); State v. Crawley, 187 N.J. 440, 450 (2006). Having established that this was, at the very least, an investigative detention of defendant from the first moment of the encounter, see Terry v. Ohio, 392 U.S. 1, 9, 16 (1968), the question is whether the police had a reasonable suspicion, grounded in specific and articulable facts, that defendant was involved in the "shots fired" incident. See Rodriquez, 172 N.J. at 126.

---

[1] Because the facts were undisputed the officer got out of the car and pointed his gun at defendant before defendant did anything, we reject the court's conclusion that this was ever a field inquiry or that it "escalated to an investigative detention not by [actions of] the police, [but] by Mr. Ford."

We think the obvious answer to that question is no.  The officer candidly testified there was nothing beyond the dispatch to make him believe defendant might be carrying a gun, and had he and his partner not "been dispatched to a call of shots fired and given the suspect description" of "a black male carrying a bag" that they "probably would have continued to drive right past Mr. Ford."  The clear import of that testimony is that defendant was not doing anything suspicious to draw the attention of the officers.[2]  He was simply a black man walking in a well-lit commercial and residential area, not known for its crime, near a train station and a supermarket carrying a backpack and a plastic shopping bag on a fall evening in Elizabeth.

The dispatched description of the suspect would certainly have been enough to permit the officers to approach defendant to ask him some questions, but only because a field inquiry of that sort requires no suspicion at all.  See Rosario, 229 N.J. at 272.  Even assuming the reliability of the dispatched report,

---

[2]  Because defendant only dropped his bags after the officer jumped from his patrol car and pointed a gun at him, we reject the trial court's finding that defendant's dropping the bags could constitute reasonable suspicion justifying the stop.  See Rosario, 229 N.J. at 277 (explaining that suspicious behavior occurring after instigation of an investigative detention "can[not] be used, post hoc, to establish the reasonable and articulable suspicion required at the outset").

which we do for purposes of this analysis, see State v. Golotta, 178 N.J. 205, 219 (2003), it cannot support the investigatory stop that occurred here for the obvious reason that the description provided nothing more than the suspect's race and sex.  See Gamble, 218 N.J. at 429 (explaining when an "anonymous tip is conveyed through a 9-1-1 call and contains sufficient information to trigger public safety concerns and to provide an ability to identify the person, a police officer may undertake an investigatory stop of that individual") (emphasis added).

That the black male suspect was reportedly carrying "a bag" added little, indeed so little the officers had no hesitation stopping defendant, a black man carrying two bags.  When one considers that the "detail" of the undescribed bag was offered to help identify a black man in a mixed commercial and residential neighborhood in Elizabeth near a Stop and Shop and the train station, its value as an identifier is clearly revealed as nil.

As the Supreme Court reminded in State v. Shaw, 213 N.J. 398, 409 (2012), "[p]eople, generally, are free to go on their way without interference from the government.  That is, after all, the essence of the Fourth Amendment — the police may not randomly stop and detain persons without particularized suspicion."  We think it plain defendant did not forfeit his

11

constitutional right to walk near a city park unmolested by police simply because he was of the same race as a suspect sought in connection with a report of shots fired nearby.

Having determined the police lacked a constitutional basis for their investigatory stop of defendant, we turn to consider whether defendant can be considered to have abandoned the bags or whether his motion to suppress the gun was properly denied because of defendant's failure to obey the officer's orders.

Turning first to abandonment, the Supreme Court held in State v. Tucker, 136 N.J. 158, 170-73 (1994), that contraband discarded after an unreasonable seizure was not abandoned. We reject as unsupported by the evidence the State's assertion that defendant dropped the bags "at the same time" the officer got out of his patrol car and before the officer ordered him to stop and put up his hands. The court's questioning of the officer made clear, as the court found, that the officer was already out of the car with his gun drawn before defendant dropped the bags. As we have determined that seizure to have been unreasonable, we reject the court's finding that defendant abandoned the bags.

That leaves the question of whether the trial court correctly denied the motion based on defendant's failure to obey the officer's orders. An analysis of that question has to begin with the understanding that in New Jersey "a person has no

A-2878-16T1

constitutional right to flee from an investigatory stop, 'even though a judge may later determine the stop was unsupported by reasonable and articulable suspicion.'" State v. Williams, 192 N.J. 1, 11 (2007) (quoting Crawley, 187 N.J. at 458). The Court held in Crawley that "a defendant may be convicted of obstruction under N.J.S.A. 2C:29-1 when he flees from an investigatory stop, despite a later finding that the police action was unconstitutional." 187 N.J. at 460.

In Crawley, the arresting officers received a radio dispatch that there was "a man armed with a gun" at the Oasis Bar on South Orange Avenue in Newark. Id. at 444. "The dispatcher described the suspect as a young black male, 5'5" to 5'7" tall, weighing about 150 pounds, and wearing a green jacket, red shirt, blue jeans, and black boots." Ibid. "Less than two minutes later," the officers saw a young man, Crawley, who "matched exactly the dispatcher's description of the suspect," walking along South Orange Avenue near the bar. Ibid. The officers knew that part of South Orange Avenue as "[a] very high narcotics area," and referred to the Oasis as a "notorious bar" known for "[a] lot of weapons offenses." Ibid. When one of the officers called from his open car window, "Police. Stop. I need to speak with you," Crawley took off running. Id. at 444-45.

The question for the Court was whether Crawley could be convicted of violating the obstruction statute, N.J.S.A. 2C:29-1, which prevents a person from purposely preventing a public servant "from lawfully performing an official function by means of flight," even if the stop was deemed unconstitutional because accomplished without reasonable, articulable suspicion. Crawley, 187 N.J. at 451. The Court held "a police officer acting on a dispatch may be 'lawfully performing an official function' even if a court later determines that reasonable suspicion was lacking to justify the stop," so long as the officer acted "in objective good faith, under color of law in the execution of his duties." Id. at 451, 460-61.

The Court, however, took pains to note that good faith is judged by an objective standard. Id. at 461 n.8. Justice Albin, writing for the Court in Crawley, explained:

> A police officer who reasonably relies on information from headquarters in responding to an emergency or public safety threat may be said to be acting in good faith under the statute. However, a police officer who without any basis arbitrarily detains a person on the street would not be acting in good faith.
>
> [Ibid.]

If defendant violated the obstruction statute, that would be a criminal offense, supporting his arrest and the search incident

14

that uncovered the gun. Obstructing the police could well constitute a break in the chain from the unlawful investigatory stop. See Williams, 192 N.J. at 11.

Whether defendant violated the obstruction statute is not easily answered here for two reasons. First, the facts on this point were not as well-developed as the sequence of events. Second, is the question of the officer's objective good faith in stopping defendant at gunpoint.

Although there is no doubt that defendant failed to comply with the officer's orders, defendant did not run from the officers. He walked towards them. Indeed, the officer testified he was "backing up. . . . [n]ot wanting [defendant] to get too close to [him]." Further, defendant did not struggle with the officers, but instead went "down to his knees." The officer testified, however, that defendant had been "order[ed] . . . to the ground, based . . . on the nature of the call." The officers "used force against [defendant] to get him to the ground" from his knees. There is also the question of whether the officer, who stopped defendant based, essentially, on

nothing more than his race, could be deemed to have been acting in objective good faith in the discharge of his duties.[3]

We need not resolve those questions, however, because we conclude that even assuming the officers had probable cause to arrest defendant for obstruction, they did not obtain "the evidence by means that are sufficiently independent to dissipate the taint of their illegal conduct."  State v. Johnson, 118 N.J. 639, 653 (1990).

Evidence seized in a warrantless search not justified by an exception to the warrant requirement is subject to suppression under the exclusionary rule.  Williams, 192 N.J. at 14.  As the Supreme Court has recently reiterated, "[t]he appropriate inquiry for courts assessing the admissibility of the evidence is whether" it "was 'the product of the "exploitation" of [the unconstitutional police action] or of a "means sufficiently distinguishable" from the constitutional violation such that the "taint" of the violation was "purged."'"  State ex rel. J.A., __ N.J. __ (2018) (slip op. at 23) (quoting Shaw, 213 N.J. at 414). To determine the answer to that question, New Jersey courts

---

[3]  We hasten to add here that the record offers no basis to question the officer's subjective good faith.  Although we are limited to the cold record, our review confirms the trial court's view of the officer's testimony as "very credible," "calm, clear [and] consistent."  We detected no hint of bias.

consider the three factors identified by the United States Supreme Court in Brown v. Illinois, 422 U.S. 590, 593-94 (1975): "(1) 'the temporal proximity' between the illegal conduct and the challenged evidence; (2) 'the presence of intervening circumstances'; and (3) 'particularly, the purpose and flagrancy of the official misconduct.'" J.A., __ N.J. __ (slip op. at 23) (quoting Shaw, 213 N.J. at 415).

Applying those factors here, we cannot conclude defendant's conduct after being confronted at gunpoint by police while walking on a public street was such as to cause a break in the causative chain between the officer's unconstitutional investigative detention and the discovery of the gun. First, there was no temporal break between the stop and discovery of the gun in one of the bags defendant was holding when confronted by police. Although generally considered the least important of the three factors, see State v. Worlock, 117 N.J. 596, 622-23 (1990), the closeness in time between the unconstitutional stop and the discovery of the handgun favors defendant.

Second, as we have already discussed, under the circumstances presented, namely that defendant, although certainly failing to cooperate, neither ran from police nor resisted arrest after going "to his knees," we would be hard pressed to find "an intervening act that marked 'the point at

which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost.'" Williams, 192 N.J. at 16 (quoting State v. Casimono, 250 N.J. Super. 173, 184-88 (App. Div. 1991), certif. denied, 127 N.J. 558, cert. denied, 504 U.S. 924 (1992)). Accordingly, we do not find the second "intervening events" factor, often the most important in the analysis, see ibid., as weighing significantly in favor of the State here.

Third, although we are satisfied, based on the trial court's findings, that the officers had no purposeful intent to violate defendant's rights, "[a] random stop based on nothing more than a non-particularized racial description of the person sought is especially subject to abuse," Shaw, 213 N.J. at 421, and, in our view, compels the suppression of the handgun here.

In sum, we reverse the trial court's denial of defendant's motion to suppress, vacate the judgments of conviction, and remand to the trial court for further proceedings in light of the suppression of the handgun. We do not retain jurisdiction.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION